THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* OLIVER A. LOFTIS, Defendant-Appellant.

First District (5th Division)   No. 76-706

Opinion filed December 2, 1977.

James Geis, Ralph Ruebner, and Kenneth L. Jones, all of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Linda Ann Miller, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a bench trial defendant was found guilty of rape, deviate sexual assault and unlawful restraint. He was sentenced to serve 8 to 20 years in the penitentiary for rape and given concurrent sentences of 8 to 20 years imprisonment for deviate sexual assault and 1 to 3 years imprisonment for unlawful restraint. On appeal he contends: (1) that favorable evidence was suppressed; (2) that he was prejudiced by an ex parte meeting between the trial judge, complainant and the prosecutor; (3) that the trial judge erred in limiting inquiry into the complainant's mental and physical condition, and in excluding testimony concerning her reputation as a prostitute and her practice and knowledge of that profession; (4) that he was not proved guilty beyond a reasonable doubt; and (5) that if the sex offense convictions are affirmed, his conviction for unlawful restraint must be reversed as it arose out of the same course of conduct as the other convictions. We reverse and remand.

Since the events at trial and the sequence in which they occurred serve as the background for the two issues we will deal with in this opinion, we will outline the pertinent facts according to the dates on which they came to light.

### Monday, October 20, 1975

The prosecutor and defense counsel stipulated that defendant was 60 years old. Both then answered ready for trial and defendant waived his right to a jury trial.

### Tuesday, October 21, 1975

The complainant testified that she was a married woman with one child. On July 12, 1974, she was living with her boy friend, Mose Wilson.

She left home that day sometime between 8 p.m. and 9 p.m. She took a cab to a tavern and proceeded to have two drinks while waiting for a man. After waiting approximately 45 minutes she left the tavern and started walking to a restaurant. Someone walked up to her and told her he had $10. She ignored the man and kept walking. The man followed and again told her he had $10. She told him that if he wanted somebody, it would have to be somebody else, and she kept walking. At this point in the trial she identified defendant as the man who approached her that night. Defendant then put something in her back and told her to keep walking. He held this object in his right hand. She had a shoulder bag with her and she dropped it. He warned her not to do anything funny and she picked her purse up. They walked into an alley and proceeded to a doorway. He opened the door with one hand and they entered a building. They proceeded to a room containing children's toys. Lights were on in the building and defendant turned the lights off at this point. Nevertheless the room they entered remained brightly lit. She did not know what the source of the light was. After they entered the playroom defendant asked her to disrobe. She took off a jacket she was wearing but refused to remove any other clothing. Defendant ordered her to take off her clothes. She took off her slacks but left a body shirt and her panties on. Defendant then forcibly removed the body shirt and the panties and had sexual intercourse with her on a tumble mat or child's bed. After the third act of sexual intercourse she screamed and defendant struck her in the head. Her head turned to the left and she saw a knife with a hooked blade lying next to defendant's right hand. Leaving the knife on the floor to her left, defendant then put his tongue on her vagina. Subsequently defendant again engaged in sexual intercourse with her. She could not recall how many times he penetrated her. Defendant kept her in the playroom for 7½ hours. She tried to escape several times during this period but defendant was lying on the floor next to her with his right leg over her legs and thighs and he had sexual intercourse with her after each of her first two attempts to move away. After her third attempt to escape, defendant put his mouth on her vagina. Defendant finally fell asleep and she got up, put her panties and body shirt on, ran out the door, put her slacks on and ran down the alley. She went to a restaurant, telephoned her boy friend and told him she had been raped. He arrived at the restaurant 10 to 15 minutes later and took her to the Illinois Masonic Hospital. She was examined at the hospital and she stayed there one week. She then left the hospital but about four days later she returned and had five operations. She further testified that the examination occurred at approximately 6 a.m. After being examined she spoke to four police officers. Then she left the hospital and went to a police station. There she looked through a book containing photos but she

did not find a photograph of her assailant. She left the police station with her boy friend. He wanted to know where the incident took place but she was not sure where it occurred and did not recognize the area as they drove past it. They returned to the area that evening and she then recognized the building in which she was raped. Accompanied by her boy friend and her baby, she again drove by the building a day later. She observed defendant at that time and stopped two police cars. She spoke to the officers and then flagged down a detectives' car. The detectives arrested defendant. She identified defendant as the assailant when he was brought out of the building. She had never met defendant before the night in question. Moreover, she did not consent to the sexual intercourse and she never gave defendant permission to perform oral copulation. Also, she did not remain in the building voluntarily and she was not married to defendant when the incident took place.

Upon completion of complainant's direct examination the trial judge decided to recess and instructed the complainant to return the next morning. She stated she would not be back the next morning. The judge ordered her to return. She asked the judge if he was going to pay for a baby sitter. The judge told her she could bring her baby with her and that baby sitters were available at the court. She said she could not afford a baby sitter and did not want anyone except her mother or herself to watch her baby. The judge again ordered her to be in court the next morning. She replied that she would see if she could get to court. The judge warned her that she might be held in contempt if she did not withhold her comments. She said: "Then I will be in contempt of court." The judge ordered her taken into custody. She said: "If you are going to take me into custody, then take my son too." She added: "I am under a doctor's care. I have to go three times a week." The judge told her that if she did not appear the following morning, she would be taken into custody and kept in custody until the case was over. She replied: "Well, they don't know where I live. I am not going to be here your Honor." Court was then adjourned.

### Wednesday, October 22, 1975

The complainant was present when trial resumed the next morning.

On cross-examination the complainant stated that she had lived with Mose Wilson for six months prior to July 12, 1974. She denied that she testified on direct examination that she was waiting for a man at the tavern. She purchased the first drink she had at the tavern and a man at the bar purchased the second. She left the hospital on July 13, 1974, but she did not have a watch on so she could not say how long she remained there. Court adjourned at this juncture.

Thursday, October 23, 1975

When her cross-examination resumed the complainant testified that defendant offered her money three times. After each of these offers she simply kept walking and did not speak to him. Defendant then put something in her back and ordered her to turn the corner. Despite the fact that there was traffic on the street, she did not scream at this point. She did not say anything to defendant before she entered the building. She never attempted to turn around and look at the object defendant held to her back or to otherwise ascertain what it was. She walked up to a steel door in the alley and defendant opened it. It was the kind of door that can only be opened from the inside unless it is left ajar. The first thing defendant did after bringing her into the building was to take her by the arm and turn off the lights in the front part of the building. He left the lights on in two offices. She asked him to answer a ringing telephone while he was turning off the lights. She said nothing else to him until they entered the playroom. They entered the playroom and defendant told her to take her clothes off. She refused to do so. He repeated his order and she again refused to disrobe. She took her jacket and slacks off after he told her to undress for the third time. She did not see his knife at this point and she had not seen it prior to this point. While she was undressing defendant removed his pants. She did not attempt to escape while he was taking his pants off. There were no chairs in the playroom. She also testified that she could not recall if there were any chairs in the playroom as she went back to the building a week after the incident and the furniture in the playroom had been rearranged. Then she testified that she sat on the one chair in the playroom and put her clothes on it. More specifically, she put her jacket, shoes and purse on the chair. She went on to testify that she never sat on the chair. In fact, she did not sit down before she had sexual intercourse with defendant. She next testified that she sat on the mat, not the chair, before she took off any of her clothes. She added that she was standing when she took her slacks and jacket off. But then she said defendant took her slacks, body shirt, jacket and shoes off of her. In any case, she put her slacks on the chair. The only remaining clothing she wore at this point was her body shirt and panties. Defendant then ripped her body shirt off.

A side bar conference was held at this point in the trial in which defense counsel asked the judge to order the State to produce the body shirt, and then argued that this article of clothing would indicate force or the lack of force and that he had a right to inspect it before continuing his cross-examination of the complainant. The judge asked the prosecutor, Assistant State's Attorney Magnes, if the State had the body shirt. The prosecutor stated that the article was not in the State's possession. The judge then asked if the State had ever possessed the article and the prosecutor denied ever having it. The prosecutor added that none of the

clothing worn by the complainant on the night of the incident was taken and inventoried by the police. When asked by defense counsel if the State ever had any indication that such evidence existed prior to this point in the trial, the prosecutor replied that he thought asking the question was "somewhat presumptuous." The judge pointed out that prosecutor Magnes was not the first prosecutor assigned to this case and said that he thought the question was impossible for him to answer. Defense counsel pointed out that the prosecutor had records which he could refer to and base his answer upon. The following colloquy then occurred:

"THE COURT: Was any clothing ever kept or in anyway used as a part of this case?

MR. MAGNES: To my knowledge, none of the clothing worn by the prosecutrix was taken by the police and inventoried.

MR. BERTUCCI [Defense Counsel]: I take his statement [to mean] he has no knowledge of anything.

MR. MAGNES: The record speaks for itself."

Following this exchange the complainant further testified on cross-examination that defendant pulled the body shirt over her head and then took off her panties. She was struggling with him at this point and the panties ripped. The sexual intercourse occurred on a mattress. After the third act of sexual intercourse he hit her with his left fist and struck her in the cheek and temple area on the right side of her face. The blow forced her head to the left. She saw his knife for the first time after she was struck. She could not say how much time transpired from the point when defendant first started having sexual intercourse with her until he completed the third act of sexual intercourse as she did not have a watch on. When asked approximately how much time transpired she responded: "As long as it takes him to shoot his sperm into me." Defendant then put his mouth on her vagina. She could not say how many acts of oral intercourse took place but she knew it was two. She did not put some of her clothes on in the building. She put her body shirt on after she left the building and then ran down the alley. Subsequently she put her slacks and jacket on but she did not have time to put her panties on. She did not call the police before she called her boy friend. She could not say how long it took to get to the hospital from the restaurant as she did not have a watch on. She arrived at the hospital sometime between 6 a.m. and 6:30 a.m. and was taken to the emergency room. She left the hospital that morning with Mose Wilson and Officer Tranchitello. They went to a police station and she remained there approximately one hour. She left with Mose Wilson and went directly home. After she left the police station Mose Wilson took her to the area of the incident at her request. They passed this area on their way home. Her child does not live with her and she and Mose Wilson pass the area of the incident every day on their way to visit her child.

Between the time she escaped from the scene of the incident and her arrival at home the next morning she did not clean herself. She did so for the first time after the incident upon her arrival at home the next morning.

On redirect examination the complainant testified that defendant removed her body shirt while she was lying down with her legs crossed. The body shirt snaps together between the legs and defendant ripped it in the area of the snaps. He also ripped it in the left shoulder area when he pulled it over her head. In addition, when he tore her panties off the elastic around them was ripped loose from the material. The police did not ask for these articles following the incident and she did not give them to the police. She did not know if she still had the body shirt. She had looked for it pursuant to the prosecutor's instructions but she was not able to find it and she thought she threw it away. Pursuant to the prosecutor's instructions she had also looked for the panties she wore at the time of the incident and she had found them. She did not have them in her possession at the moment—she brought them to court the day before and left them either in the courtroom or in the prosecutor's office.

On re-cross-examination the complainant testified that she did not go home after the incident and change her clothes.

At this point in the trial defense counsel pointed out to the trial judge that shortly before the complainant's cross-examination was completed court had recessed and the judge had met with the prosecutor and defense counsel in his chambers. There a discussion had been held about whether the prosecutor was aware of the existence of complainant's panties. During this conference the prosecutor said that he had no knowledge whatsoever about any articles of torn clothing. Then on redirect examination of the complainant the prosecutor elicited from the complainant the information that he had directed her to conduct a search for the panties and that she had brought them to him. Defense counsel further stated that he was not aware that any torn clothing, specifically any torn panties, existed prior to the redirect examination and that throughout the case he had been led to believe the opposite. He then moved for dismissal on the basis of the prosecutor's conduct. In response the prosecutor stated that none of the complainant's clothing was recovered and inventoried. During his interview of the complainant a few days ago she referred to the articles of clothing she was wearing at the time of the incident. He asked her if she still had the articles and she responded that she did not know if she did. When asked if the interview occurred prior to trial the prosecutor responded: "I usually interview my witnesses prior to trial." The next time he spoke to her she told him that she could not find the body shirt, but she brought the panties and slacks with her to his office. He examined the panties and slacks at that time and then returned them to her as he did not intend to offer them into evidence.

At the conversation in chambers he was asked if he knew if the clothing had been recovered and inventoried. He responded that to the best of his knowledge none of the clothing had been recovered and inventoried. He recently searched his office for the panties but he could not find them and he did not know where they were. Following these statements the judge asked the prosecutor to bring the body shirt and panties into court if he could obtain them. The judge also denied the motion to dismiss after further argument by defense counsel. Defense counsel then moved for a new trial and that motion was denied.

### Friday, October 24, 1975

Cook County Sheriff's Police Investigator John Lenihan testified that he went to an apartment building earlier in the day pursuant to the prosecutor's instructions. There he met the complainant in the lobby and she gave him a yellow plastic bag which he brought to the courtroom.

The prosecutor and defense counsel then took the bag into the conference room and examined its contents. The bag was given to the court upon their return to the courtroom. The prosecutor then reiterated his story about the clothing and added:

> "On the day she took the witness stand she came into my office with these garments. I examined the panties and did not notice any evidence that the clothing was ripped or torn, which was consistent with what she had told me earlier and what she was to testify to under oath. I then returned to her the articles of clothing."

### Monday, October 27, 1975

The complainant took the stand and identified the yellow plastic bag as hers. She opened the bag, removed the slacks and panties it contained and identified them as hers. She testified that she wore this clothing on the date of the incident. After the incident she did not give any clothing to the investigating police officers as none of them asked her to do so. When she returned home from the police station she threw the body shirt, slacks and panties on the floor of her closet. Since that time she had sent the slacks to the cleaners to be cleaned and to have the zipper moved, but she had not worn them. She wore the panties once since the incident but had not worn the body shirt since then. She found the clothing before she moved from the apartment in August of 1974, but she lost the body shirt when she moved. Sometime prior to Monday of last week she spoke to the prosecutor about the case but she could not remember the date of this conversation. She also talked to him in his office on Monday, October 20, at 10 a.m. During that conversation he asked her where the clothing was. She did not have these belongings with her then. The next time she came to his office, which was either Tuesday or Wednesday, she brought the

slacks and panties with her. At that time he opened the bag they were in and looked at the articles. He saw the panties in the bag and she said they were the panties she was wearing when she was raped. He closed the bag and told her to take it up to the courtroom. He did not take anything out of the bag. She took the bag of clothing and went directly up to the courtroom. She entered the courtroom and walked into the jury room. There she remained until she was called to testify. She testified for the first time that day and then discussed with the judge whether she would have to return the next day. When she left the courtroom she took the clothing with her. Sometime thereafter she spoke to the prosecutor on the telephone about this clothing and he asked her whether she still had the articles. She told him she still had them but she did not know where they were. He asked her to attempt to locate them and to notify him if she did. Sometime later she called him at his office and informed him that she had found the articles. He said he would send an investigator to pick them up. Subsequently two detectives arrived at her home and she gave them the bag containing the slacks and panties. While the panties had been laundered and worn once since the incident, they were in essentially the same condition at trial as they were in on the night of the incident—they were still torn where defendant tore them. She indicated the place where defendant tore the panties by marking them with a red marker at a point where some threads were torn away from the material. Defense counsel asked the judge for a magnifying glass and the judge said he did not have one. Defense counsel then remarked: "Well, I can't see it with my naked eyes."

On cross-examination the complainant testified that upon completion of her examination on Wednesday, October 22, she went to the judge's chambers to apologize for her conduct in court. She had the bag with her when she talked to the judge. When she left his chambers she took the articles with her and went home. When the prosecutor later telephoned and asked her about the clothing she told him she had recently moved and could not find the articles. She also told him she thought she had left them in either the judge's chambers or his office. She did not bring the clothing with her to court on Thursday, October 23. The next time she handled the bag of clothing was on Friday afternoon.

At this point in the trial an evidentiary hearing was held during which co-counsel for the defense examined both prosecutor Magnes and defense counsel Bertucci, and the prosecutor cross-examined defense counsel Bertucci. With regard to the ex parte meeting between the prosecutor, the complainant and the judge, defense counsel testified that he first learned of the meeting through the complainant's testimony on Monday, October 27. From her testimony that day he also learned that she had the bag containing the panties with her in the judge's chambers

during that meeting. With respect to the panties, defense counsel Bertucci testified that the motion for pretrial discovery he filed requested notification of the existence of any and all physical evidence in the State's possession and of such evidence that it had knowledge of. The court entered an order requiring this discovery. While prosecutor Magnes was not present when the order was entered, another prosecutor was present. Prior to trial prosecutor Magnes appeared before the judge in connection with the case at bar on five or six occasions but never informed him of the existence of the panties. Nor did the prosecutor inform him of their existence prior to calling the State's first witness, the complainant. During a recess which interrupted the complainant's cross-examination on October 22, he asked the prosecutor in the judge's chambers if he had any knowledge of the whereabouts of any clothing worn by the complainant on the day of the incident and co-counsel asked if any of the clothing had been inventoried. The prosecutor's response was that no clothing had been taken and inventoried and that he had no knowledge of the whereabouts of the clothing.

The judge then interrupted the hearing and stated that trial started on Tuesday and after adjournment on Wednesday, October 22, he retired to his chambers. He heard a knock on the door and when he opened it he saw the complainant and prosecutor Magnes. The prosecutor said: "Your Honor, this witness would like to apologize for her conduct, she was emotionally upset and she wanted to ask your indulgence." The complainant apologized and the judge responded that it was all right, he understood her emotional reaction. Then he told her to return the next day. The judge added that this was all that took place. After this exchange she left and the prosecutor left. The judge did not notice whether she had the bag of clothing with her and she did not mention anything about it.

The hearing resumed and prosecutor Magnes testified that the first time he saw the panties was on the day trial began, Tuesday, October 21. The complainant had the panties with her that day and he talked to her and saw them before he put her on the stand. This was the first day on which she testified and while he saw the panties before she began her testimony he did not thereafter inform either defense counsel or the judge of their existence. They were informed of their existence and of his knowledge of their existence a day or two later through the redirect examination testimony of the complainant.

Defense counsel then argued that this evidence was suppressed. The judge responded:

> "* * * I understand the use of the word suppressed as having several connotations. One of its connotations is that somebody withheld something which they were lawfully obligated not to do. In that respect I think perhaps that the State was guilty of not doing

what the discovery rules provide for and that is the submission of physical evidence at the earliest opportunity."

The judge went on to find that defendant was not so injured as to be precluded from making a proper defense and that the prosecutor's action did not prevent defendant from getting a fair trial. He also found that the prosecutor had made a mistake but had not acted willfully and that the evidence in question was brought in within sufficient time for "the defense to make whatever use of it they wanted." The judge then ruled that the panties were not suppressed.

The State rested its case-in-chief at this point.

Wednesday, October 29, 1975

At this juncture the prosecutor and defense counsel stipulated that a specimen taken from the complainant on July 13, 1974, had been examined and analyzed under laboratory conditions and that no sperm had been found in the specimen.

Opinion

Defendant contends that favorable evidence was suppressed. We agree.

Supreme Court Rule 412(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(c)) provides:

"Except as is otherwise provided in these rules as to protective orders, the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor."

■■■ Prosecutor Magnes testified that he saw the panties on Tuesday, October 21, before the complainant testified for the first time. He admitted that he did not disclose their existence to defense counsel until Thursday, October 23, and he then informed defense counsel of their existence and his knowledge of their existence through the indirect means of the complainant's redirect examination testimony. Following re-cross-examination of the complainant on Thursday, October 23, the prosecutor told the court that the complainant brought the panties to his office, he examined them and then returned them to her. Following the testimony of Cook County Sheriff's Police Investigator John Lenihan on Friday, October 24, the prosecutor repeated that he examined the panties and then returned them to the complainant. On Monday, October 27, the complainant testified that on the day she testified for the first time she took the panties to the prosecutor's office, he opened the bag, saw the panties and was told that they were the panties she wore when she was raped. Then he closed the bag and returned it to her. We believe that

these facts establish that the State had certain material and information within both possession and control, namely, the panties and knowledge of their existence. If this material or this information tended to negate the guilt of the accused, then Rule 412(c) was violated. Defendant was charged with the offense of rape. One of the elements of that offense is force. On Thursday, October 23, during cross-examination, the complainant testified that defendant removed her panties and ripped them in doing so. The same day she testified on redirect examination that when defendant tore her panties off the elastic around them was ripped loose from the material. Following Investigator Lenihan's testimony on Friday, October 24, the prosecutor told the court that when he examined the panties in his office, he did not notice any rips or tears in them. When the complainant was recalled on Monday, October 27, she testified that while the panties had been laundered and worn once since the incident, they were in essentially the same condition that day as they were in after the incident. She indicated the place where the panties were torn with a marker, marking them where some threads were torn away from the material. Defense counsel could not see this tear. Under these facts and circumstances we believe the condition of the panties tended to negate the element of force, and hence the guilt of the accused as to the offense of rape. Consequently, we believe that these facts and circumstances present a clear violation of Supreme Court Rule 412(c). Since there is no exception to this disclosure rule which permits the innocent or inadvertent suppression of favorable evidence, whether the prosecutor acted willfully in suppressing this evidence, or whether he simply made a mistake, as the court found, is irrelevant.

Moreover, the following passages were included in defendant's motion for pretrial discovery:

"The Defendant requests * * *:

7. Any books, papers, documents, photographs or tangible objects which the prosecution intends to use in the hearing or trial or which were obtained from or belong to the accused, co-defendants, complainant, or witnesses.

14. That the prosecution disclose to the defense the names and addresses of any witness or witnesses that may be or would be favorable to the defense. * * * The same disclosure is requested of any physical evidence or scientific evidence that might be or would be favorable to the defense."

While these passages do not contain a specific request for the panties, together they make a general request for disclosure of the existence of, and for production of, the panties. While prosecutor Magnes was not present when the order was entered, another prosecutor was present and prosecutor Magnes was in charge of the State's case for some time prior to

trial. In a side bar conference on Thursday, October 23, defense counsel made a specific request for production of the body shirt. When the judge asked the prosecutor if the State had it or ever possessed it, the prosecutor denied ever having it. When the defense counsel then asked if the State ever had any indication that *such evidence* existed prior to that point in the trial, and the court asked if any clothing was ever kept or in anyway used as a part of the case, the prosecutor's answers were evasive. When defense counsel then attempted to have the answers clarified, the prosecutor said: "The record speaks for itself." We agree with this statement and we find a second general request for disclosure of the existence of the panties in this exchange. Shortly before the complainant's cross-examination was completed the judge met the prosecutor and defense counsel in chambers. Unfortunately a transcript of the conversation which ensued is not before us and prosecutor Magnes and defense counsel have different recollections of what was said during that meeting. Nevertheless it is clear from the record before us that despite the disclosure and production requests, defense counsel was not informed of the existence of the panties prior to the redirect examination of the complainant on Thursday, October 23. On that date defense counsel told the court that he based his defense upon the premise that the State did not have any articles of torn clothing. On Friday, October 24, defense counsel told the court that the defense would have been conducted differently if the State had disclosed the existence of the panties before trial. Obviously defense counsel could have revised his defense strategy if the prosecutor had told him about the panties before the first witness testified on Tuesday morning. Obviously the panties tended to contradict the complainant's testimony on the defendant's use of force. However, because he did not learn of their existence until the redirect examination of the complainant, defense counsel had no opportunity to question her about them during her original cross-examination. Furthermore, the panties were not produced until Friday, October 24. Prior to that time defense counsel was not aware that the panties, whose elastic was supposedly ripped loose from the material, only had some threads torn away from the material. Thus defense counsel had no opportunity to confront the complainant with them before her original examination ended on Thursday, October 23. Additionally, when complainant again testified on Monday, October 27, the court restricted defense counsel's cross-examination to eliciting testimony on the question of whether the articles of clothing were suppressed. Consequently defense counsel had no opportunity to directly confront the complainant with the condition of the panties on the issue of the defendant's use of force. These circumstances do not support the findings of the court below that the panties were brought in within sufficient time to allow the defense to

make whatever use it desired of them, and that defendant was not prejudiced by the prosecutor's action. However, we note that it is not our function to speculate as to how defense counsel might have used material evidence which was withheld in violation of Supreme Court Rule 412, and the error involved in withholding evidence from discovery is not dependent upon an affirmative showing by the defendant that he was prejudiced in fact. *People v. Parton* (1976), 40 Ill. App. 3d 753, 758, 354 N.E.2d 12; *cf. People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40; *People v. Payne* (1976), 44 Ill. App. 3d 502, 358 N.E.2d 409.

■■ Furthermore the foregoing facts and circumstances present a clear violation of Supreme Court Rule 412(d) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(d)), which provides:

"The State shall perform its obligations under this rule as soon as practicable following the filing of a motion by defense counsel."

Although the trial judge appears to have arrived at the same conclusion on Monday, October 27, he went on to make findings which indicate that he thought any error resulting from this violation was harmless. We would encourage the type of nondisclosure we find in the instant case and promote confusion over the extent to which discovery rules must be complied with if we were to find the error before us harmless. (See *People v. Parton* (1976), 40 Ill. App. 3d 753, 759, 354 N.E.2d 12.) Consequently we are not prepared to say this error is harmless.

Defendant's second contention is that he was prejudiced by an ex parte meeting between the trial judge, complainant and the prosecutor. We agree.

■■ Upon completion of complainant's direct examination on Tuesday, October 21, complainant was instructed to return the next morning. She refused to do so and her refusal brought her close to being found in contempt. During her cross-examination on Monday, October 27, complainant testified that she had gone to the judge's chambers to apologize for her conduct in court. During an evidentiary hearing held later that day, defense counsel testified that he first learned of the ex parte meeting through the testimony complainant gave earlier in the day. The judge interrupted the hearing and related an account of the ex parte meeting. We do not question this account and we find no evidence in the record which persuades us to accept defendant's argument on appeal that the trial judge conducted a private investigation outside defendant's presence. On the other hand we have before us a bench trial and hence it was the trial judge's function to consider complainant's demeanor. We can only speculate as to the effect of her incredible outburst if no ex parte apology had been made, but we feel certain that this apology immediately had at least some rehabilitative effect. Under the facts and circumstances of the case at bar, this ex parte rehabilitation of the sole

occurrence witness was highly improper. However the facet of this ex parte meeting which we find even more disturbing is that the prosecutor of his own volition brought the alleged victim and sole occurrence witness to the judge's chambers. If we did not condemn this action we would in effect encourage out-of-court attempts to rehabilitate witnesses and thereby influence judges in bench trials. The State's reliance on *People v. Hicks* (1970), 44 Ill. 2d 550, 256 N.E.2d 823, is misplaced as there are numerous differences between that case and the one before us. For example, in that case a woman who did not even testify at trial went to the judge's chambers on her own volition and requested permission to sit in the front of the courtroom. In the instant case the prosecutor guided the sole occurrence witness to the judge's chambers for the purpose of allowing her to apologize for disgraceful courtroom behavior and only a naif could conclude that her apology did not have a favorable impact upon the State's case.

We find it unnecessary to consider defendant's other contentions since, for the foregoing reasons, the judgment of the Circuit Court of Cook County is reversed and this case is remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

SULLIVAN, P. J., and MEJDA, J., concur.