THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* VINCENT MAHAFFEY *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 77-666, 77-902, 77-1057 cons.

Opinion filed May 12, 1978.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and Wendy Paul Billington, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendants were convicted of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2(a)) and sentenced, respectively, to terms of eight to 24 years and five to 15 years in the Illinois Department of Corrections. On appeal they contend that they were denied a fair trial because: (1) the State failed to furnish to them before trial information concerning exculpatory evidence and the trial court erroneously denied their motion for a continuance, and (2) the jury was improperly influenced by certain remarks made by the trial judge.

The trial commenced on July 12, 1976, when eight jurors were selected. On the next day defendants moved for a mistrial, or, alternatively, a continuance, but were not heard on that motion until after jury selection was completed. They then argued that although they had requested, in their motions for discovery, information regarding any lineups, and had been told by the State that no lineups were held, the State had just that morning tendered to them police reports which indicated that two of the State's witnesses had failed to identify defendants at a lineup which was held on March 3, 1976. The State admitted to informing defendants' counsel that, to the best of its knowledge, no lineup had been held, and stated that the police reports concerning the lineup had just come into its possession that morning and had been immediately tendered to defendants' counsel. The motion for a mistrial or a continuance was denied, but the court granted defendants 30 minutes to examine the newly produced police reports. The trial then resumed and the following pertinent evidence was adduced.

*Gene Vorreyer, a McDonald's employee*

On March 2, 1976, at approximately 9:17 p.m. he was working as a cook in back of the McDonald's restaurant on West 211th Street in Matteson, Illinois, when the back door opened and two men, one of whom carried a shotgun, entered. One of the men searched him and took his wallet and

his knife. The other man came out of the back carrying his C.B. radio. He looked once very quickly towards the front of the restaurant and saw two other black males, but he could not give any identifying characteristics about them.

*Diane Capulsinski, a McDonald's employee*

She was at the front counter of the restaurant taking orders when she looked up and saw that people were going under tables. Defendant Mahaffey was standing in front of her holding a shotgun, and defendant Dunn was standing at the front door with a small gun in his hand. Mahaffey ordered her to open the cash register and put the money in a bag. After she opened the register and pulled the drawer onto the counter, he took the bills out and put them in a bag. He ordered her to open all the other registers, but she told him she could not open the last register because the manager had the only key. He told her to "hurry up and get it or I'll blow your head off." She went to the back of the restaurant and saw Mary Schulz and others sitting on the floor while two men were taking money out of the safe and putting it into a sack. When she said that she had to get a key, one of the men pointed his shotgun at her and ordered her to sit down. One of the men then started running around carrying a C.B. radio and saying that he "found a C.B." The men took the money and left. Neither of those two men were in court.

On cross-examination she admitted that although she heard someone say "hit the floor," and saw people go down, she did not see who gave the command.

*Carolla Utermark, a McDonald's employee and Mary Schulz, McDonald's night manager*

They substantially corroborated the testimony of the other employees. Utermark added that she heard a man who she identified in court as defendant Dunn say, "Don't anybody move. This is a holdup." After the two men who had been in the back of the restaurant left, Schulz locked the doors and called the police.

On cross-examination Utermark admitted that although she had attended a lineup on March 3, 1976, and was closer to that lineup than she was to defendant Dunn at trial, she did not identify him as being in the lineup. She also acknowledged that she did not see defendant Mahaffey enter the store, or that he had anything in his hands. Schulz also admitted that she had attended a lineup on March 3, 1976, and although defendant Mahaffey was in that lineup, she failed to identify him.

*Keith Kelosey, Neal Chance and Robert Drexel, customers*

They were standing or sitting at the front of the restaurant when defendants Mahaffey and Dunn entered and the robbery occurred. Dunn tapped Kelosey on the shoulder and said, "This is a hold-up" and Kelosey responded, "you're kidding." Dunn turned him around, said, "I'm not

kidding," and shoved a pistol in his face. Defendant Mahaffey came up behind Drexel, said "freeze," and without his permission took the change from his dollar which had been on the counter. Kelosey and Chance identified defendant Dunn's weapon as a dark colored handgun which looked a lot like People's Exhibit No. 1. All three customers obeyed defendants' orders to get on the floor and not to move.

On cross-examination Chance acknowledged that he gave a description of the defendants to the police on the night of the robbery, saying that one of them wore a turquoise stocking cap, and the other wore double knit green pants, a black coat and hat, and high heel platform shoes. He admitted that he saw Mahaffey during the robbery for approximately 30 seconds, but did not see him holding a weapon, nor did he see either defendant take any money. Drexel likewise acknowledged that he had not noticed whether Mahaffey had been armed. None of these witnesses attended a lineup concerning this case.

*Al Piotrowski, Calumet Park Police Officer*

On March 2, 1976, he and his partner were patrolling on the 2 to 12 p.m. shift in their squad car. At approximately 10 p.m. he stopped a vehicle containing four males at 119th Street and I-57 after he observed that the driver had failed to properly signal a turn. As his partner sent a radio message to the station, he approached the driver of the stopped vehicle, advised him of the violation, requested his driver's license, and was told that it was in the glove box. In order to assist the driver, he followed him to his car, and upon shining his flashlight towards the glove box, observed a C.B. radio and a turquoise stocking cap laying on the front seat. He and his partner had previously received a radio message that four people, including one male Negro wearing a turquoise stocking cap, had been involved in an armed robbery in Matteson and had taken an undetermined amount of money and a C.B. radio. After he ordered the four men out of the car, he observed and retrieved a shotgun. Dunn had been seated in the rear of the car, and Mahaffey on the front passenger's seat. He also observed and retrieved from the car a McDonald's bag containing money, a .38 caliber revolver, a knife and some rolled-up coins. All of the items taken from the car were handed over to the Matteson police.

On cross-examination he estimated that he received the radio message about the robbery at 9:30 p.m. and that the area where he stopped the vehicle was approximately a 20-minute car ride away from the area where the robbery occurred.

*Defendant Gerald Dunn on his own behalf*

At approximately 5:30 p.m. on March 3, 1976, he went from work to a liquor store located at 700 East 63rd Street and sat at the bar drinking with some friends when he noticed a fellow named Vance Worex whom he

had seen in the neighborhood. Worex agreed to drive him to 159th and Lexington. They left the liquor store at approximately 6:30 p.m. Worex introduced him to two men named Larry and Robert who were in a white 1971 Vega. He went with Worex to Worex's green 1971 Ford where he met a short fellow named Lloyd who was in the car and was wearing a turquoise stocking cap. He and Worex got into the car and with the white Vega following they went to a filling station where he paid for four dollars worth of gas. He also gave Worex a dollar as payment for the ride. They then got onto the I-57 highway, coming to a stop after they turned off on the corner of 159th Street and Lexington. He looked in his pocket to find out exactly where he was going, but found to his surprise that he did not have the last two numbers of the address. Worex drove him to Vickie's Lounge at 159th and Albany so that he could make a phone call. Worex told him that they would get something to eat and come back to pick him up. After he got out, the two cars drove away. He went into Vickie's Lounge and called his employer in order to find the correct address. He stayed in the lounge for approximately one hour and a half until 9:30, when he left to find an "el" that he could take back to Chicago. After he walked three blocks he noticed that Worex was hollering at him from the other side of the street. He got into the car with Lloyd and Worex and although he noticed for the first time a C.B. radio on the dashboard and a McDonald's bag sticking out from under the front seat, he never saw any weapons in the car. Worex explained to him that they had somehow become separated from the white Vega, and the three of them went back onto the highway, heading north towards Chicago. They stopped at a Burger King at 127th and Ashland to get something to eat where he saw defendant Mahaffey. Mahaffey, Lloyd, Worex and he left the Burger King together, drove away in Worex's car, and a short time later were stopped by the police.

On cross-examination he admitted that he went to a record store after work on March 2, 1976, and that his previous testimony that he went to the liquor store from work was incorrect. He also admitted that he left the liquor store at approximately 7:30 p.m. and that his testimony that he left at 6:30 p.m. was incorrect. He acknowledged that his difficulty in locating the address he wanted was not that he was missing the last two digits of the address, but that all he had was an address of 159th and Lexington. He denied seeing the police officer remove a handgun, a knife, coins, a wallet or money from the car.

OPINION

Defendants' first contention is that in light of the State's failure to respond to their discovery request and tender to them the information concerning the pretrial lineup, the trial court's refusal of their motion for a

continuance denied them a fair trial. Defendants concede that the State tendered the information to them upon its receipt, that its failure to tender it previously was unintentional, and that following a half-hour recess, defendants' counsel used the information to impeach the testimony of the two witnesses who attended the lineup and in their closing argument. They nevertheless argue that the State violated Supreme Court Rule 412(f) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(f)), which provides that:

> "The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged."

In support of their argument defendants cite and rely on *People v. Elston* (1976), 46 Ill. App. 3d 103, 360 N.E.2d 518, in which the fourth district of this court ruled that when evidence favorable to the accused was withheld for at least two days before trial and was then revealed during various stages of the trial on an apparently piecemeal basis, defendant was denied a fair trial. Defendants contend that under *Elston*, the withholding of the lineup information in this case requires reversal of their convictions. A close examination reveals, however, that defendants' reliance on *Elston* is misplaced.

● 1, 2   We note, initially, that although we will join the *Elston* court in following the rule that a reviewing court should not speculate as to whether better use could have been made of the withheld evidence at trial (46 Ill. App. 3d 103, 106, 360 N.E.2d 518, 520), we clearly can review the entire record to determine if, in light of all the evidence adduced, any error involving the withheld evidence was harmless. (See *People v. Szabo* (1977), 55 Ill. App. 3d 866, 871, 371 N.E.2d 117, 120.) In *Elston*, the withheld evidence consisted of the facts that two of the five occurrence witnesses against defendant attended a lineup at which defendant was present but failed to make any identification, two more witnesses attended that lineup and identified another person there as the one who had committed the offense, and the remaining witness identified defendant only after being shown a polaroid colored picture of him, and black and white photographs of other individuals. The withheld evidence therefore tainted or could have been used to impeach the credibility of all the witnesses against defendant. In the instant case, however, even if the testimony of the witnesses who attended the lineup is totally discounted, the testimony of the remaining witnesses to the occurrence clearly identified the defendants as the men who, armed with guns, entered the McDonald's restaurant at the date, time and location in question, forced the patrons at gunpoint to remain quiet, and took or assisted in the taking of money and other items. Within 45 minutes of the occurrence they were apprehended together in a car, in possession of items stolen from the

restaurant as well as weapons used in the robbery. The only exculpatory evidence presented was defendant Dunn's testimony which was unsupported by any other witness and which, by his own admission, contained certain contradictions and inaccuracies. It is the province of the jury, as the trier of fact, to resolve questions regarding the weight of the evidence or the credibility of the witnesses, and a determination of guilt will not be set aside on review unless the evidence is so improbable as to raise a reasonable doubt as to guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) Moreover, it is not our policy to reverse a criminal conviction merely because an error has been committed, unless it appears that real justice has been denied or that the jury's verdict may have resulted from such error. (*People v. Clark* (1976), 41 Ill. App. 3d 419, 354 N.E.2d 134.) In light of all the evidence adduced in this case, we conclude that although the State's failure to fully respond to the discovery request was improper, defendants were not denied a fair or just trial, and any error involved in the denial of defendants' motion for a continuance was harmless.

Defendants nevertheless argue that it would be improper to find that only harmless error had been committed in this case for the same policy reason as the one expressed in *People v. Loftis* (1977), 55 Ill. App. 3d 456, 370 N.E.2d 1160. In that case, although the complainant testified that defendant had ripped her panties during his sexual assault and that they were in essentially the same condition at trial as they were at the time of attack, the apparently unripped condition of the panties tended to negate the element of force and the guilt of the accused. The complainant brought the panties to the prosecutor, but he evaded any questions concerning them, and only indirectly disclosed their existence to defense counsel two days later, during complainant's redirect examination testimony. In reversing defendant's conviction, the court found that in spite of defendant's prior request for any physical evidence, the State had improperly suppressed the favorable evidence which it had within its possession and control. The court further stated that to say that the error involved was harmless would serve to encourage the type of nondisclosure involved in that case, and promote confusion over the extent to which the discovery rules must be complied with. (55 Ill. App. 3d 456, 469, 370 N.E.2d 1160, 1170.) In the instant case there should be no confusion that, as defendants argue, the flow of information required by Supreme Court Rule 412(f) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(f)) broke down, and that the goal of pretrial discovery, which is to promote the fact-finding process and eliminate the tactical advantage of surprise (*People v. Rayford* (1976), 43 Ill. App. 3d 283, 356 N.E.2d 1274) was not met. This situation is not excused by the argument that the police did not advise the State of the evidence, since the police and the State's Attorney

are required to cooperate and insure that all relevant information will be provided so that discovery can be accomplished. (Ill. Rev. Stat. 1975, ch. 110A, par. 412(f)); *People v. Young* (1978), 59 Ill. App. 3d 254, 375 N.E.2d 442.) The failure of the State to meet its duty in this regard must be strongly condemned, and we trust that our decision in this case will not encourage such failures to occur in the future. Unlike the *Loftis* situation, however, the State in the instant case did not suppress exculpatory information that was in its possession, but did tender the information directly to defendants as soon as it was received. In light of that fact and the overwhelming untainted evidence adduced against defendants, we conclude that any error involving the undisclosed evidence was harmless and that the interests of justice would not be served by reversing defendants' convictions.

Defendants' last argument is that three remarks made by the trial judge during the cross-examination of defendant Dunn denied defendants a fair trial. The remarks were made during cross-examination of the defendant by the State's Attorney, as follows:

"STATE'S ATTORNEY: Am I correct that when you told counsel that you left work and went to the liquor store, that was not correct?

DEFENDANT DUNN: I am —

Q. Were you incorrect in your prior testimony?

DEFENSE COUNSEL: Objection. He is not letting him answer.

THE COURT: He is not answering. It is a simple question.

\* \* \*

Q. What was the partial address?

A. The partial address was 159th. That is what I had.

Q. 159th? Did you have anything else?

A. And Lexington.

DEFENSE COUNSEL: Objection. He has answered the question.

THE COURT: An answer would help.

\* \* \*

Q. So your testimony was incorrect when you said you definitely looked at the clock at 8:35?

A. I said I came into the store—

Q. Was it incorrect?

A. I came into the store at 8:35.

DEFENSE COUNSEL: He is harassing the witness. This is improper.

THE COURT: If the witness would answer the question we would have no problem."

■■ An examination of the record reveals that the remarks complained

of were occasioned by defense counsel's objections and provoked by the witness' failure to properly respond to the State's Attorney's questions. Taken in context, the remarks appear to have been made, within the court's discretion, as admonitions to the witness to respond to the questions, rather than as attempts to discredit the witness before the jury. We therefore conclude that the remarks complained of cannot be said to have substantially prejudiced defendants or denied them a fair trial. See *People v. Thornhill* (1975), 31 Ill. App. 3d 779, 333 N.E.2d 8; *People v. Osborne* (1966), 78 Ill. App. 2d 132, 223 N.E.2d 243.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.