THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ARTHUR ROBINSON, Defendant-Appellant.
First District (5th Division) No. 1—85—0893

Opinion filed September 22, 1989.

324

MURRAY, P.J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Joan E. Disis, and Penelope Moutoussamy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

A jury found defendant, Arthur Robinson, guilty of the murder of his girl friend Allie Bee Anderson, with whom he lived in a Chicago, Illinois, apartment building. The trial court sentenced the defendant to an extended term of 70 years' imprisonment. On this appeal defendant Robinson contends for reversal that he was denied a fair trial because of (1) the prosecutor's noncompliance with discovery and failure to furnish defendant's attorney with defendant Robinson's oral statement of and the admission of the totally unrelated testimony of defendant Robinson's argument with and threat to kill the apartment building custodian hours before Anderson was killed; (2) the prosecutor's unsupported assertion to the jury, in the complete absence of any proof, that State witness and Anderson's neighbor, Juana Buckner, told the police that she recognized the defendant Robinson's voice as the voice of Anderson's assailant in Anderson's apartment during the fatal attack upon her; (3) the State's extensive inadmissible hearsay testimony that Anderson, the deceased, called defendant Robinson by the name "Omar," to connect defendant Robinson with the homicide; (4) the State's inflammatory, prejudicial, irrelevant, inadmissible hear-

say evidence that the defendant Robinson had not paid his rent and that State witnesses had told Anderson, the deceased, to leave and move to Indiana; (5) the prosecutor's erroneous and improper representation to the jury that defendant Robinson's attorney before trial withheld and destroyed his investigative notes; (6) the trial court's erroneous refusal to give the jury the second paragraph of Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981) (IPI Criminal 2d) on circumstantial evidence; (7) the trial court's erroneous refusal to instruct the jury on voluntary manslaughter; (8) the evidence failed to prove defendant Robinson guilty beyond a reasonable doubt; and (9) the extended-term 70 years' imprisonment sentence was improper. We reverse and remand for a new trial. Our reasons follow.

Juana Buckner and her husband Cornell Buckner lived in an apartment next door to the apartment in which Allie Bee Anderson—the deceased—and her live-in boyfriend, defendant Arthur Robinson, lived. Juana Buckner and Allie Bee Anderson were also co-workers, as maids, at a nearby hotel and defendant Robinson walked them to work daily. About 3:30 p.m. on May 6, 1983, the date of the homicide, defendant Robinson and Cornell Buckner picked up Juana Buckner and Allie Bee Anderson at the hotel. Before the four of them left the hotel, Juana Buckner, while talking to Cornell down the hall, overheard what sounded to her like an argument between Anderson and defendant Robinson. When the four of them left the hotel, the Buckners parted Anderson and Robinson's company to go shopping. Later, when the Buckners returned to their apartment about 5 p.m., they overheard the fatal altercation in Anderson's apartment between Anderson and her assailant. To avoid repetition, the more specific details of the Buckners' witnessing of the incident are later set forth herein.

Anderson's son, Roscoe Harris, and his girl friend, Elisha Ingram, who lived in Indiana, had a key to Anderson's apartment and frequently visited Anderson on weekends. About 11 p.m. on May 6, 1983, Elisha Ingram, Roscoe Harris and his brother, Victor Harris, came to Chicago on a surprise visit to Anderson. They found the front and rear doors to the apartment locked and the back bedroom window broken. They also discovered Anderson's body lying on the back bedroom floor. Anderson's clothing was packed in a carrying case in the front closet. Elisha Ingram noticed writing scribbled on the living room wall, and she described a large picture also on the living room wall as a mural, initialed, "Bee's Paradise," designed for Anderson by her former boyfriend, Walter Hiawatha.

Anderson's neighbor and co-worker, Juana Buckner, knew that

Hiawatha was Anderson's former boyfriend, that Hiawatha still "hung around" Anderson's apartment building and that after Hiawatha and Anderson broke up, Hiawatha would occasionally come by the hotel where Anderson worked and attempt to walk Anderson home, but Anderson would refuse. A few weeks before Anderson's homicide, Juana Buckner and Anderson were approached by Hiawatha as they entered a cab. Hiawatha attempted to grab Anderson's clothes. Although Juana Buckner admitted that she said in her pretrial statement that Hiawatha yanked Anderson out of the cab, at trial, however, Juana Buckner denied this occurrence. Juana Buckner further admitted that, a few weeks before Anderson's homicide, Hiawatha had followed Anderson and Buckner around and that Hiawatha followed Buckner and Anderson all the way home from the hotel at which they worked.

Chicago police department evidence technician Joseph Moran testified that when he arrived at Allie Bee Anderson's apartment, he observed her body with her bra and underpants pulled down. (Sperm were later discovered in her vagina.) Anderson was dead from multiple knife wounds.

Evidence technician Moran recovered two knives from the apartment which he took to the crime laboratory but did not process. Moran also lifted an undetermined number of fingerprints from the wall, the pantry door, a metal table leg, a metal table stand, and a piggybank inside the apartment. He also observed and photographed the scribbling on the wall, but the trial court refused to allow defense counsel to cross-examine him on whether he could identify the letters of or read the scribbling. Elisha Ingram and Roscoe also observed the scribbling on the wall, which had not been there before.

After discovering their mother's body in her apartment, Roscoe Harris, his brother Victor, and two of their friends went looking for Arthur Robinson. They waited for him on the street corner at the deceased's building for one and a half hours. When Robinson arrived, Roscoe and Victor Harris and their two friends approached him, whereupon Robinson stated, "I didn't do nothing. I didn't do nothing." The four beat and kicked Robinson until the police arrived.

Chicago police officer Reeger testified that he observed the four men beating Arthur Robinson and stopped them. After speaking to the Harris brothers, Officer Reeger arrested Robinson. Because of the injury and bleeding of Robinson's head inflicted by the Harris brothers and their two friends, Officer Reeger took Robinson to the hospital for treatment.

Robert Lenz, a Chicago police department crime laboratory micro-

analyst, testified that after examining their blood samples, he determined that defendant Robinson's blood was a type O and deceased Anderson's blood was a type B. Robinson's T-shirt was positive for blood type O and blood type B was found on Robinson's jogging pants which had been ripped off him. Microanalyst Lenz further related that type B blood was not identifiable to a particular person and was consistent with anyone who had type B blood; that anyone who bled during a mutual struggle and came in contact with Robinson could have been the source of the type B blood that was found on his clothing at the time of his microanalysis; Lenz did not know that Robinson had been injured in a fight which involved mutual bloodshed and he did not obtain the blood type of Roscoe Harris, or anyone else. Lenz did not know the source of the type B blood on Anderson's clothing or how long it had been there.

Chicago police officer Thomas Krupowicz, a fingerprint analyst, testified that of the 36 suitable fingerprints lifted from the metal table stand in the apartment of the deceased Anderson and the defendant Robinson, 10 fingerprints belonged to Robinson and two belonged to Anderson; the remaining 24 suitable fingerprints did not belong to Robinson or Anderson and Krupowicz had not determined to whom these fingerprints belonged. A single suitable print from the table leg did not belong to defendant Robinson or to the deceased Anderson. Two of the four suitable fingerprints from the piggybank belonged to defendant Robinson, but Krupowicz did not know to whom the remaining two suitable prints from the piggybank belonged, but he did know however that neither belonged to either Robinson or Anderson. Fingerprints analyst Krupowicz did not test for fingerprints of anyone else other than Anderson and Robinson, and more particularly, he did not test for fingerprints of or even obtain a fingerprint from Walter Hiawatha.

Defendant Robinson's first contention for reversal is that the trial court erred in admitting into evidence statements of the defendant's threats to and argument with the apartment building custodian which the prosecutor had not furnished defendant's attorney pursuant to the discovery rules. We agree that this was error.

The uncontradicted testimony of Juana Buckner and Cornell Buckner established that Allie Bee Anderson was killed in an altercation in her apartment around the hour of 4:30 to 5 p.m. Cornell Buckner was permitted to testify that earlier that morning, at about 11:30 a.m., in the downstairs lobby of the apartment building the defendant became engaged in an argument for 15 minutes with the apartment building maintenance man about the defendant throwing trash off the

back porch, that the defendant threatened to kill the maintenance man and told him, "If you don't get away from me I'll throw you through a window. I'll kill you."

One of the grounds on which defendant's attorney objected to this testimony and moved for a mistrial, both of which were overruled, was that the prosecutor had not furnished him with these statements of the defendant's pursuant to the discovery rule and that he was taken by surprise by them.

■■ ■ The prosecutor is obligated to disclose to defendant's attorney, upon request, all oral statements made by the defendant, and a list of witnesses thereto, whether or not such statements have been reduced to writing. (107 Ill. 2d R. 412(a)(ii); *People v. Weaver* (1982), 92 Ill. 2d 545, 558, 442 N.E.2d 255; *People v. Shegog* (1976), 37 Ill. App. 3d 615, 619, 346 N.E.2d 208, 211.) The paramount goal of this discovery rule is to avoid giving the prosecutor the unwarranted trial advantage of surprise. (*People v. Szabo* (1977), 55 Ill. App. 3d 866, 871, 371 N.E.2d 117, 120.) The prosecutor must disclose not only statements made by the defendant to law enforcement personnel in the nature of an admission or confession, but all statements made by the defendant. (*People v. Davis* (1984), 130 Ill. App. 3d 41, 49, 473 N.E.2d 387, 394.) This includes a defendant's statement to witnesses unconnected with the State. (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.) Compliance with this discovery rule is mandatory. *Davis,* 130 Ill. App. 3d at 49, 473 N.E.2d at 394.

■■ ■ The prejudice resulting from surprise, from inadequate preparation, as well as from the lack of opportunity to investigate the circumstances surrounding an undisclosed alleged statement is so incalculable that it cannot be conjectured by the court. (*People v. Young* (1978), 59 Ill. App. 3d 254, 257, 375 N.E.2d 442, 444; *People v. Loftis* (1977), 55 Ill. App. 3d 456, 469, 370 N.E.2d 1160, 1169.) Consequently, the prosecutor's error in withholding a defendant's statement from defense counsel during discovery may not necessarily be dependent upon the defendant's affirmative showing that he was prejudiced by the prosecutor's failure to produce the defendant's statement. (*People v. Loftis* (1977), 55 Ill. App. 3d 456, 469, 370 N.E.2d 1160, 1169.) Moreover, this court has recognized that defense counsel's request for a continuance is absolute if defense counsel did not learn of the defendant's undisclosed statement until the jury had heard it. (*People v. Weaver* (1982), 92 Ill. 2d 545, 559-60, 442 N.E.2d 255.) Under such circumstances, even a trial court's admonition to the jury to disregard the statement may not suffice to overcome potential prejudice to the defendant. *People v. Young* (1978), 59 Ill. App. 3d 254,

257, 375 N.E.2d 442, 444.

*People v. Davis* (1984), 130 Ill. App. 3d 41, 49, 473 N.E.2d 387, 394, is quite similar to the case at bar. In *Davis*, the State failed to inform defense counsel of an oral statement made by the defendant to the victim that he had recently robbed another man. On appeal, counsel contended in *Davis* that the prosecutor's nondisclosure of the defendant's oral statement prevented defendant from making a motion *in limine* to bar his statement as evidence of this other crime, and, alternatively, from investigating the facts and circumstances of the making of the defendant's statement to possibly impeach the witness. In reversing the defendant's conviction, this court agreed that the evidentiary purpose of the defendant's statement at trial was to establish that Davis had a propensity to commit robbery and held that it was error for the trial court to refuse to take action to exclude this undisclosed statement of the defendant, especially since the defendant was completely surprised when the statement was first disclosed to him at trial. *Davis*, 130 Ill. App. 3d at 49, 473 N.E.2d at 394-95.

▪️ Likewise, in the instant case the record establishes that counsel for defendant Arthur Robinson was wholly unaware before trial of Robinson's argument and threats to the apartment building maintenance manager. It was in the midst of the trial when the State elicited this argument and the threats of defendant Robinson from State witness Cornell Buckner. They took defense counsel completely by surprise. As in *Davis*, Robinson's statements were damaging, because their sole expressed (invalid) purpose and effect were to show Robinson's "aggressiveness" and "mood" to kill on the day in question (hereinafter further discussed). (*People v. Lampkin* (1983), 98 Ill. 2d 418, 421-27, 457 N.E.2d 50, 53-55.) Indeed, *Lampkin*, like *Davis*, recognized that evidence of a defendant's prior totally collateral threat is severely damaging evidence, not only because it permits a guilty verdict on the basis of the jury's hostility to a defendant for his evil nature or violent tendencies, but also because it enables and encourages the jury to conclude that a defendant is predisposed to act violently and therefore irrationally find that he committed the violent crime for which he is being tried. (*Lampkin*, 98 Ill. 2d at 426-27, 457 N.E.2d at 54.) Consequently, had defendant's counsel been timely and properly provided with Robinson's statement which showed his propensity for violence, his counsel could have moved before trial to exclude it on that basis. (*Davis*, 130 Ill. App. 3d at 49-50, 473 N.E.2d at 394-95; *Lampkin*, 98 Ill. 2d at 421-27, 457 N.E.2d at 53-55.) However, as in *Davis*, the jury trial in the instant case had already begun and the jury had already heard this damaging statement when defense

counsel learned of it for the first time. Consequently, the prosecutor's untimely surprise disclosure of defendant Robinson's statements was prejudicial error, not only because it was too late for defense counsel to investigate the statements, but also because it was too late for counsel to make a motion *in limine* to bar these inadmissible, unconnected, collateral threats by defendant Robinson against the maintenance manager as evidence at Robinson's trial. *Davis*, 130 Ill. App. 3d at 49-50, 473 N.E.2d at 394-95.

It was error, as in *Davis*, for the trial court to deny defense counsel's motion for a mistrial and to admit Robinson's statements of a totally unrelated collateral threat, never tendered during discovery. This violation of the discovery rules and error entitle the defendant Robinson to a new trial.

■ Cornell Buckner's testimony of the defendant's 11:30 a.m. argument with the apartment maintenance man about the defendant throwing trash off the back porch and the defendant's threats to throw him through a window and kill him was properly objected to by the defendant's attorney on the additional ground that this testimony was irrelevant to the defendant's trial for the totally unrelated 4:30 p.m. to 5:30 p.m. murder of Anderson, his live-in girl friend. The trial court erroneously overruled this defense objection and motion for a mistrial on the expressed, but likewise erroneous, ground:

> "I don't think throwing trash off the balcony or having an argument with the maintenance man is material to the—to cause a mistrial. *I think it is relevant to the defendant's mood and state of mind on this day, and, apparently, this aggressiveness has been shown earlier, and I think that's relevant for the People to show*." (Emphasis added.)

The trial court did not cite, the prosecutor did not cite in the trial court, and the prosecutor has not accurately cited before this court any authority for the proposition that the defendant's 11:30 a.m. argument with and threats to throw the apartment maintenance man through a window and to kill him, arising out of the defendant's allegedly throwing garbage off the balcony, were admissible as evidence at the defendant's trial to establish his *"mood,"* or *"state of mind,"* or *"aggressiveness,"* 5½ hours later, during his alleged murder of his live-in girl friend.

The error of the admission of Cornell Buckner's testimony of the defendant's morning argument with and threat to kill the apartment's maintenance man was compounded by the additional similar irrelevant prejudicial inadmissible testimony of State witness police officer Raymond Cooley. He testified that in response to a radio message of a

battery in progress at Allie Bee Anderson's apartment, he and his partner went there, knocked on the door, but received no answer, although he heard movement inside the apartment. He attempted to open the door but found it locked. He told Cornell Buckner that they could not enter Anderson's apartment without a search warrant, and they proceeded to leave. The following direct testimony of Officer Cooley then occurred:

"Q. And what happened?

A. We were approached by another person, and as we were walking out of the apartment doorway, he said—.

[Defense Attorney]: Objection."

Thereupon, the following colloquy occurred out of the hearing of the jury:

"THE COURT: What's he going to say?

[Assistant State's Attorney]: He's going to say that he met a person who identified himself as the manager, and that he told him of prior problems he's had with the defendant. ***

THE COURT: I'm going to sustain the objection to the conversation about trouble with the defendant ***."

Officer Cooley then testified in the presence of the jury as follows:

"[Assistant State's Attorney]: Q. Now, Officer Cooley, this person you had a conversation with, did he identify himself?

A. He said he was the manager's son.

Q. All right. What did you ask him?

A. We asked him if he had keys for the apartment.

Q. Did he give you anything?

A. No.

Q. What did he respond to you? What did he say?

A. He said he had had a verbal altercation—.

Q. No. Officer, state—.

[Defense Attorney]: Objection. Judge, I want a sidebar.

THE COURT: Sustained.

[Defense Attorney]: Judge, I have a motion, at this time.

THE COURT: Denied. Continue.

[Defense Attorney]: Can the record reflect what my motion is, Judge?

THE COURT: Continue."

Although the officer did not testimonially identify the person with whom the manager's son had the verbal altercation, and even though the trial court sustained defense counsel's objection to the testimony, no imagination was required for the jury to knowingly conclude that the defendant was obviously the person with whom the manager's son

had the altercation and to whom the manager's son referred. The invalid damage was done. The jury heard it. The jury was not instructed to disregard it. But as Moran Allen observes, as the title of his article, "When Jurors Are Ordered by the Court to ignore testimony, the jury instead ignores the court's order," at page 31 of the Wall Street Journal, Monday, January 25, 1988, issue.

The prosecutor flamboyantly capitalized on the inadmissible evidence of the defendant's prenoon argument with and threats to the apartment maintenance man. He exacerbated the erroneous admission of this testimony twice in his arguments to the jury. The prosecutor first stated in his initial opening argument:

"They [Cornell Buckner and defendant Arthur Robinson] came back to the apartment building at approximately 11:00 o'clock and that is where the defendant has, according to Cornell Buckner, an argument with the maintenance man. The maintenance man tells the defendant something about throwing garbage out of the window and they are arguing, according to Cornell Buckner. The argument ends with the defendant threatening the maintenance man, something to the effect of, 'Get away from me or I'll throw you out of a window and kill you.' "

Thereafter, in his final closing argument, the prosecutor for the second time, again (mistakenly) argued to the jury:

"Ladies and gentlemen, the defendant, *just before* he killed Allie Bee Anderson, got in a fight with a maintenance man for throwing garbage from the second floor. His response to that situation was to threaten to throw somebody out of a window and kill them.

*A few minutes later* he is in an argument at the Belair Hotel with the victim. *Moments after that* he is in that apartment with knives in his hands; the victim is receiving defense wounds; furniture is going all over the place and the victim is stabbed ***." (Emphasis added.)

Parenthetically, we note that it was not "just before," but, rather, the evidence was that it was at least 4½ hours before Allie Bee Anderson was killed that the defendant argued with and threatened the maintenance man. Likewise, it was not "a few minutes" after the defendant's argument with and threats to the maintenance man that Juana Buckner overheard what appeared to her to be an argument between Anderson and Robinson in the hotel where she and Anderson were employed, as the prosecutor mistakenly argued.

■■ ■ A defendant's threats on a collateral matter to a person other than the deceased are inadmissible simply because they are prej-

udicial and irrelevant. (*People v. Lampkin* (1983), 98 Ill. 2d 418, 421-27, 457 N.E.2d 50, 53-55; *People v. Bryant* (1983), 115 Ill. App. 3d 215, 222, 450 N.E.2d 744, 749.) In *Lampkin,* the Illinois Supreme Court restated the long-honored distinction between a threat against the person actually killed and a threat against someone else. (*Lampkin,* 98 Ill. 2d at 427, 457 N.E.2d at 55.) The *Lampkin* decision explained that where a defendant's threat against the *deceased* may be relevant to show malice and criminal intent, a defendant's threat against *a third person* or a threat of a general nature has no probative value and serves no other purpose than to "arouse prejudice or hostility on the part of the jury," against the defendant. (*Lampkin,* 98 Ill. 2d at 427, 457 N.E.2d at 55.) Evidence of a defendant's prior collateral threat is severely damaging with a jury, not only because it improperly encourages a jury's guilty verdict on the basis of its hostility against a defendant because of his evil nature or violent tendencies, but, also, because it erroneously motivates a jury to find that the defendant may be predisposed to act violently and therefore committed the violent crime for which he is charged. (*Lampkin,* 98 Ill. 2d at 426-27, 457 N.E.2d at 54; *People v. Huber* (1985), 131 Ill. App. 3d 163, 167, 475 N.E.2d 599, 602.) The supreme court in *Lampkin* quoted with approval its earlier language in *Scott:*

"[A] 'threat by the accused to kill or injure a person other than the deceased, or a mere idle threat of a general nature not directed to any particular person, is not admissible to show malice' [or intent to kill]." *Lampkin,* 98 Ill. 2d at 425, 457 N.E.2d at 53, quoting *People v. Scott* (1918), 284 Ill. 465, 474-75, 120 N.E. 553.

There was no proper purpose for introducing this prejudicial evidence. The sole reason for the testimony that defendant Robinson threatened to kill the maintenance man was the impermissible purpose of showing Robinson's propensity for violence. The trial judge in fact allowed the evidence of the defendant's collateral threat for the erroneous and prejudicial expressed purpose of showing the defendant's "aggressiveness" or "mood" to kill on the day in question. Additionally, that defendant Robinson had a propensity to act violently and had acted in accordance with that propensity is precisely the way the prosecutor treated this evidence when he argued to the jury, as previously set forth herein.

■ During the proceedings on the defendant's motion for a new trial, the trial court adroitly retreated from its initial trial position that evidence of the defendant's collateral argument with and threat to the maintenance man was admissible to establish the defendant's

aggressiveness and mood on the date of Anderson's homicide. At the post-trial proceedings, the trial court gratuitously inferred that the purpose of this evidence might properly have been to establish Cornell Buckner's ability to subsequently recognize Anderson's assailant's voice as the voice of the defendant in Anderson's apartment during the fatal attack upon her. This shifted, suggested position by the trial court hardly deserves further discussion. The simple appropriate means for the prosecutor to properly establish Cornell Buckner's ability to recognize defendant Robinson's voice was merely the introduction of the Buckners' testimony that they were Robinson's friends and neighbors and daily talked and socialized with him. Indeed, Cornell Buckner testified that he and Robinson spent the entire day together prior to Anderson's death. Thus, Cornell Buckner's testimony of defendant Robinson's prenoon-day argument with and threat to the maintenance manager to establish Buckner's ability to recognize Robinson's voice utterly failed to warrant the trial court's gratuitous justification for its disclosure to the jury, particularly when "voice recognition" was never the prosecutor's purpose for it, not even during his closing argument to the jury. The trial court erred in admitting this testimony, and the prosecutor egregiously compounded the error in arguing this testimony to the jury as aforesaid. Reversal is therefore required.

The prosecutor also erred, which likewise requires reversal, when he insinuated, wholly without any proof, that Juana Buckner told the police that during the assailant's attack upon Anderson in her apartment, she recognized the assailant's voice to be the voice of the defendant.

Juana Buckner testified that she and Cornell Buckner left defendant Robinson and the deceased Anderson to go shopping, when their tour of duty as maids ended at about 3:30 p.m. at the hotel. Juana Buckner related that she and Cornell Buckner arrived home about 4:30 p.m. She heard banging and crashing noises coming from the Robinson-Anderson apartment, which lasted about 15 to 20 minutes. Juana Buckner heard Anderson say, "Put the knives away. Stop hitting me. Omar, I thought you loved me," followed by a scream.

Juana Buckner testified that she considered herself a close friend of Anderson, and that of the times she was with Anderson, or went out with Anderson and Robinson, and all the time she was good friends with Anderson, and during all the conversations Anderson had with Juana Buckner about Robinson, Juana Buckner never heard Anderson call or refer to defendant Robinson as "Omar." Juana Buckner additionally testified that she did not recognize the male voice she

heard coming from the Anderson-Robinson apartment.

Juana Buckner also testified that she had never heard Anderson and Robinson argue like that and she had never seen or heard Robinson slap, hit or threaten Anderson, and that they got along well and had discussed marriage.

Juana Buckner testified, on cross-examination by defense counsel, as follows:

"Q. In fact, she [Allie Bee Anderson] was yelling so loud you couldn't hear the man's voice, could you?

A. No, you couldn't hear the man's voice, but I knew he was in there.

Q. You knew someone was in there, but you really couldn't hear the man's voice, right?

A. Right."

Juana Buckner again related, on redirect examination by the prosecutor:

"Q. Now, you told the public defender when they went out to go interview you about what happened that you never recognized the male voice?

A. Right.

Q. Did you tell them that?

A. Yes.

Q. Now, you did tell him, though that you never heard Arthur [Robinson] and Bee [Anderson] argue like that before?

A. Yes.

Q. Is that right?

A. Yes.

* * *

Q. You heard the voices coming from Bee and Arthur's apartment on May 6, 1983, the banging and crashing, and you heard words spoken by Bee.

* * *

Did you recognize the man's voice in that room?

A. No."

Over the defense attorney's repeated objections, the prosecutor was permitted to additionally, on redirect, examine Juana Buckner as follows:

"Q. Now, Miss Buckner, you talked to detectives on May 7, 1983, in the early morning hours when the incident was very fresh in your mind, isn't that correct?

A. Yes.

* * *

THE COURT: Do you remember that conversation when you talked to the police?

A. Not all of it.

* * *

Q. *And at that police station, you told the detectives that there was no doubt in your mind—.*

[Defense Counsel]: I object, at this time, your Honor.

THE COURT: Overruled.

[Assistant State's Attorney]: Q. *There was no doubt in your mind that the argument that you overheard emanating from the victim's apartment involved that of the victim and Robinson. Did you tell the detectives that?*

A. Repeat yourself.

Q. *Didn't you tell the detectives on May 7, 1983, in the early morning hours or that next day, that you did recognize his voice?*

A. I can't remember.

Q. Okay.

A. *I just can't remember."* (Emphasis added.)

One of the grounds of defense counsel's objections to this foregoing redirect examination of Juana Buckner by the prosecutor was that the prosecutor did not have any evidence that Juana Buckner ever told any officers, or anyone else, that she recognized Anderson's assailant's voice as the voice of the defendant Robinson, and thus, the prosecutor totally lacked the necessary refuting evidence to impeach Juana Buckner. Defense counsel urged that such impeachment evidence did not exist. The prosecutor made no contrary assertion to the trial court and did not present one iota of evidence that Juana Buckner had ever made any such inconsistent statement. Yet, the prosecutor was allowed to insinuate to the jury by his foregoing redirect examination of her that she had done so.

Subsequently, in his closing argument the prosecutor wrongfully explained and improperly argued to the jury his evidentially baseless insinuation, that Juana Buckner recognized Anderson's assailant's voice to be the defendant's voice, as if the insinuation were actual proof. The prosecutor erroneously argued to the jury:

"Now, they [Cornell Buckner and Juana Buckner] are standing out in front of the doorway and they hear this argument. *** So, what do they hear? According to both Juana and Cornell Buckner, they hear banging and crashing as the furniture was falling or being thrown, *both of them recognize the defendant's voice as one of the people arguing,* and they both recog-

nized Allie Bee Anderson's voice as the other person, which was screaming. *Now, they can't make out the words that the defendant is saying,* but they do make out Allie Bee Anderson's words \*\*\*." (Emphasis added.)

▮▮▮ The prosecutor's aforesaid tactics, his failure and inability to perfect impeachment of this favorable defense testimony, and his argument to the jury thereon converted improper insinuations and innuendos to proof. The tactic of constructing a foundation for impeachment without supporting evidence is condemned precisely because impeachment by innuendo is intolerable. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Littlejohn* (1986), 144 Ill. App. 3d 813, 821-24, 494 N.E.2d 677; *People v. Starks* (1983), 116 Ill. App. 3d 384, 390-91, 451 N.E.2d 1298, 1303-04; *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 404, 428 N.E.2d 503, 509; *People v. Morris* (1980), 79 Ill. App. 3d 318, 330, 398 N.E.2d 38, 47; *People v. Orr* (1977), 45 Ill. App. 3d 660, 359 N.E.2d 1237.) Consequently, when a prosecutor, in laying the foundation for impeachment, insinuates the existence of a prior inconsistent statement by a witness and the witness either denies or is unable to recall making the statement, the prosecutor must produce evidence in rebuttal that the prior inconsistent statement was made. *People v. Morris* (1980), 79 Ill. App. 3d 318, 330, 398 N.E.2d 38, 47; *People v. Orr* (1977), 45 Ill. App. 3d 660, 666, 359 N.E.2d 1237, 1241.

The defendant quite persuasively argues before us that Juana Buckner's inability to recognize Anderson's assailant's voice as defendant Arthur Robinson's voice was testimony highly favorable to the defense had it not been improperly undermined by the prosecutor's insinuation of a prior inconsistent statement by her. Juana Buckner was a neighbor to defendant Robinson and the deceased Anderson. She expressly testified that she knew Robinson's voice and, accordingly, would have identified it as the voice of Anderson's assailant had she been able to so identify it. Moreover, this highly favorable defense testimony was elicited not from a defense witness but rather from a State witness.

In addition, this highly favorable defense testimony, the defendant contends, had it properly remained untainted by prosecutorial improper innuendo, would have served to discredit the voice identification testimony of Juana's husband Cornell, who was similarly situated to Juana at the time the assailant's voice was heard by them. (*People v. Outlaw* (1978), 67 Ill. App. 3d 327, 331, 384 N.E.2d 898, 901.) In *Outlaw*, this court reasoned that one witness' inability to identify the defendant reflects adversely on the credibility of other witnesses who

make a positive identification. (*Outlaw*, 67 Ill. App. 3d at 331, 384 N.E.2d at 901.) The defendant urges that this reasoning could have had an impact on the jury in the instant case, had the prosecutor not improperly insinuated that Juana Buckner told the detectives that the offender's voice was the defendant's voice. Moreover, the defendant posits, had this error not occurred, the *Outlaw* reasoning would have been particularly compelling to the jury, because Cornell Buckner's incriminating voice identification of the defendant was made by him for the very first time at trial, and because he, too, had previously agreed with Juana Buckner that only the deceased's voice was recognizable. Therefore, the defendant insists, the prosecutor's invalid insinuation that Juana Buckner, a key State witness, had identified Arthur Robinson as Anderson's assailant by his voice was highly prejudicial to the outcome of the trial. We agree.

The prosecutor's foregoing persistent redirect examination tactic of substituting innuendo for proof discredited Juana Buckner's testimony, which strongly indicated that Robinson was not the offender in this crime. As previously discussed, Juana Buckner knew Robinson's voice and would have recognized it had Robinson been Anderson's assailant. Consequently, on these facts, the prosecutor's totally inaccurate and unsupported insinuation that Juana Buckner had made a prior inconsistent statement that she recognized Anderson's assailant's voice as the defendant's was particularly damaging and intolerable. It deprived Robinson of a fair trial and requires that Robinson's conviction be reversed and the cause remanded for a new trial.

Cornell Buckner also testified to the sounds, words and voices he heard emanating from Allie Bee Anderson's apartment when he and Juana Buckner returned home from their shopping errand. He testified that he heard Anderson say from her apartment, "Well, you shouldn't have taken the money out of the [piggy] bank. Omar, I thought you loved me," and then she screamed.

We again parenthetically note that Cornell Buckner (1) did not tell the defense investigator that he could recognize the male voice coming from Anderson's apartment; (2) told the defense attorney during their out-of-court pretrial investigation interview of him and a statement that he could hear sounds in the apartment, but that only Allie Bee Anderson's voice was distinct; and (3) nevertheless, stated at trial, for the very first time, that he recognized the male voice engaged in the argument with Anderson as defendant Arthur Robinson's voice.

We additionally note, as an aside, that it was also during Cornell

Buckner's direct examination trial testimony that he, again for the first time, ever stated that after the noise subsided in Anderson's apartment, he observed the defendant Robinson for about 10 seconds sticking his head out of the Anderson-Robinson apartment door. Yet, Cornell Buckner did not provide this extremely vital information to the detectives to whom he spoke on May 7, 1983, immediately after Anderson's killing was discovered, or when he later spoke to the defense attorney, or in his written, signed statement of his knowledge of the homicide. Moreover, when Robinson allegedly stuck his head out of the apartment door, significantly, Cornell Buckner did not ask him what the noise was all about, or if Allie Bee Anderson was alright. Nor did he inform Robinson that the police had been knocking at his door.

The defendant urges that the State witnesses' testimony that the defendant Arthur Robinson was also called and was known as "Omar," to identify the defendant as Anderson's assailant, was inadmissible as evidence and requires reversal. We disagree.

Both Juana Buckner and Cornell Buckner testified that they heard Anderson refer to her assailant in her apartment as "Omar" during the altercation which resulted in Anderson's death. Although Juana Buckner was Anderson's co-worker and neighbor and had never heard Anderson call or refer to Robinson as "Omar," nevertheless, Cornell Buckner, Roscoe Harris—Anderson's son—and Elisha Ingram contrarily testified. All of them related that they were present and heard Anderson call and refer to Robinson as "Omar." The defendant Robinson argues that this testimony identifying him as Anderson's assailant was inadmissible under *People v. Escobar* (1979), 77 Ill. App. 3d 169, 395 N.E.2d 1028. The State initially argues that even though the defendant had three separate opportunities to object to the admission of this testimony, he failed to do so and likewise failed to rely on or raise this issue in his motion for a new trial. The State contends that the defendant therefore waived this issue on appeal. (*People v. Seaberry* (1978), 63 Ill. App. 3d 718, 723, 380 N.E.2d 511.) Because the cause will have to be retried, we decide the issue. *People v. Bryant* (1986), 113 Ill. 2d 497, 507, 512, 499 N.E.2d 413.

The defendant's reliance on *Escobar* is grossly misplaced. In *Escobar*, the State's single occurrence witness, Joseph Bradtke, identified the defendant as the driver of a car which carried the gunman who shot and killed the victim. Bradtke recognized the driver as an old high school acquaintance whom he knew as "New York." Defendant's claim of error was the admission of Bradtke's testimony that "everybody" present at the scene also knew defendant as "New York." The

reviewing court agreed that the witness Bradtke's testimony that everybody knew defendant as "New York" was inadmissible hearsay and that its admission into evidence constituted reversible error, despite other evidence that the witness picked the defendant as the offender out of a lineup and otherwise identified the defendant as the offender to the police.

■■ *Escobar*, of course, is clearly distinguishable; there, the witness Bradtke testified to what he thought others knew. His testimony that he himself knew defendant as "New York" was not objectionable. Likewise, in the case at bar, Elisha Ingram, Roscoe Harris and Cornell Buckner testified that they *themselves* knew defendant as "Omar," having heard Anderson call him by that name. They did not testify in the case at bar, as did the witness in *Escobar*, that everybody else knew defendant as "Omar." Therefore, *Escobar* is inapplicable here. *Escobar* merely holds that a witness may not testify to what he believes other witnesses know.

> "Bradtke's testimony that 'everybody' knew the defendant as New York, presumably meaning that his friends had been able to identify the suspect Escobar as 'New York,' if not as the driver, is hearsay." *Escobar*, 77 Ill. App. 3d at 176.

This hearsay testimony that others knew defendant as "New York" was held to be inadmissible and its admission into evidence reversible error:

> "[T]he jury might *** have believed Bradtke and assumed the other witnesses to the crime kept silent out of fear, as the prosecution hinted. We should not speculate about how the jury reacted; we must assume the statement was prejudicial." *Escobar*, 77 Ill. App. 3d at 176.

■■ Defendant's application of *Escobar* to this case is fatally flawed. Testimony in the instant case by three witnesses that they personally heard the deceased refer to defendant as "Omar" is not the same as a witness' testimony that "everybody knew defendant as New York." The testimony of the witnesses that they had heard and knew defendant's nickname was Omar was not hearsay and was properly admitted.

Defendant next argues that the testimony that the rent of the apartment had not been paid and that an invitation was made to Anderson to move to Indiana was inadmissible prejudicial hearsay. The State maintains that this evidence was properly admitted for the relevant purpose of showing Anderson's intention to leave defendant, thereby supporting the State's theory that defendant killed her for that reason.

The evidence that Anderson's family had invited her to move to Indiana was Elisha Ingram's testimony that she and Roscoe Harris, Anderson's son, were coming to Chicago to "try and take her back with us because we had got jobs and everything, and we wanted her to get a job and stay with us." Ingram also stated that Harris had talked to Anderson about it the day before. Roscoe Harris also testified that the day before his mother was killed, he called and spoke to her about her coming to live in Indiana. The trial judge overruled defendant's objection, but later sustained it as to these conversations.

■■ The State argues that this foregoing testimony was properly admitted to show that defendant killed Anderson because she was planning to leave him. Generally, evidence which shows that the accused had a motive to kill the victim is relevant in a homicide case if the evidence establishes the existence of the motive relied upon or alleged. (*People v. Harbold* (1984), 124 Ill. App. 3d 363, 376, 464 N.E.2d 734.) The evidence presented here of which complaint is made comes within this general rule. Elisha Ingram testified that she and Roscoe Harris had both talked to Anderson about her leaving Chicago. Roscoe Harris also testified that he had spoken with his mother on that subject. This evidence, coupled with evidence that Anderson's bags were packed and that defendant was arguing with Anderson when he picked her up at work that day, would allow a jury to reasonably infer that Anderson was indeed planning to leave and that the defendant knew and objected to it.

Defendant relies on *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, where certain motive evidence was held to be improper hearsay. However, the evidence admitted in *Harbold* is clearly distinguishable. The State's theory in *Harbold* was that defendant killed his girl friend's husband to prevent her from moving to Phoenix. The evidence relied upon, however, came from a witness who testified that, four years earlier, the witness had had a conversation with defendant's girl friend, during which the girl friend gave an indication that she and defendant had a relationship. The court stated that such "evidence was relevant because it tended to show some relationship from which the jury could have inferred motive. [Citation.] However, the probative value of the evidence suffered from its remoteness in time; evidence that the two spent time alone together predated the crime by three years or more." 124 Ill. App. 3d at 377.

Here, evidence of Anderson's intent and preparation to leave defendant was relevant to defendant's motive to kill her. Unlike in *Harbold*, however, in the case at bar the conversations were ongoing and had just recently occurred, the day before Anderson was killed.

Moreover, the evidence in *Harbold* was improper because it was from a witness who related what the defendant's girl friend had told the witness. The defendant's girl friend was the proper one to testify to her relationship with defendant. In the instant case, both witnesses were on the witness stand and were available for cross-examination on the subject. See *Harbold*, 124 Ill. App. 3d at 375.

Motive evidence is proper. In *Harbold*, the purported motive evidence was held to be improper hearsay because it was a statement spoken by a party who did not testify, and the statement did not actually amount to evidence of a motive. The relationship of the defendant and his girl friend four years before the murder, presented by second-hand evidence of what the defendant's girl friend had stated to the witness, was improper. The defendant's reliance on *Harbold* is ill-founded.

Roscoe Harris testified that his mother, Allie Bee Anderson, the deceased, paid the rent for the apartment, that she usually paid the rent before the tenth day of each month, but that she had not paid the May 1983 rent. Roscoe Harris testified that he knew the rent was unpaid because he had asked the manager. This testimony, the State contends, was properly offered to corroborate the other evidence of defendant's motive, namely, that Anderson was planning to leave him, and for that reason the defendant killed her.

Clearly, Roscoe Harris' testimony that the May 1983 rent for the Anderson-Robinson apartment had not been paid was inadmissible hearsay testimony and was erroneously admitted. The manager or the rent collector of the apartment building would have been a more appropriate witness to establish Anderson's nonpayment of the May 1983 rent. But this testimony was merely corroborative of the other properly admitted evidence of defendant's motive. The other motive evidence was Elisha Ingram and Roscoe Harris' invitation to Anderson to move with them in Indiana, Anderson's bags packed in the closet, and the earlier argument between Anderson and the defendant at the hotel. Moreover, the prosecutor never mentioned the rent testimony in his closing argument, although he therein referred to the other, proper motive evidence. The error was therefore harmless.

The defendant next contends that the prosecutor engaged in prosecutorial misconduct by improperly bringing to the jury's attention, through the guise of attempted impeachment of a defense witness, that defense counsel had withheld and destroyed before trial his investigative notes of his interview of State witness Juana Buckner. The chronological scenario of this episode follows.

During pretrial discovery proceedings, the prosecutor informed

the trial court that he had received from defense counsel a deleted portion of a two-page document of defense counsel's interview of the anticipated State witness, Juana Buckner. The prosecutor requested that the trial court order defense counsel furnish him defense counsel's complete notes of that interview. Defense counsel objected to any further submission by him of his unsubmitted notes of his interview of Juana Buckner, on the ground that the notes were his work product and therefore nondiscoverable, and further, because the supreme court discovery rules did not require defense counsel to disclose to the prosecutor an impeaching statement made by a prosecution witness. The trial court viewed the notes in question, made additional deletions therefrom, overruled defense counsel's objections and ordered the notes be turned over to the prosecutor.

At trial, on cross-examination of Juana Buckner, defense counsel questioned her regarding Anderson's former boyfriend, Walter Hiawatha. The apparent purpose of this questioning was to raise an inference that Hiawatha, not defendant, may have killed Anderson. Defense counsel attempted to show that on one instance Hiawatha had behaved violently towards Anderson. He asked Juana Buckner if Hiawatha had ever yanked Anderson out of a cab. Juana Buckner recalled the incident but denied that Hiawatha had pulled Anderson out of the cab. Defense counsel then asked Juana Buckner if she hadn't told him during his interview of her that Hiawatha had, indeed, physically pulled Anderson out of the cab. She then responded that she had so told him. Defense counsel did not seek to have Buckner confirm which of her two inconsistent statements, *i.e.*, her trial testimony or her statement to him, was true.

During the defense case, defense counsel advised the trial court that Karen Costello, then an attorney and law clerk for a circuit court judge and a former law clerk for the defense attorney, would be called to testify to Juana Buckner's pretrial statement to Costello and him that Hiawatha had pulled Anderson out of a cab, as impeachment of Juana Buckner's contrary trial testimony. It would appear that inasmuch as Buckner acknowledged and admitted during her cross-examination trial testimony that she had told Costello and the defense attorney during their pretrial interview of her that Hiawatha had pulled Anderson from a cab, Costello's testimony thereof was therefore not impeaching, but was merely cumulative. In any event, the trial court ordered that the prosecutor's cross-examination of Costello be limited to this particular topic and the prosecutor expressly stated and agreed that he would abide by the cross-examination restrictive order and so confine his cross-examination.

Thereupon, Costello was called as a defense witness and testified that Juana Buckner had indeed told her and defense counsel that Hiawatha had physically pulled Anderson out of a cab. The prosecutor's cross-examination of defense witness Costello, set forth in the appendix hereto, following her foregoing purely innocuous direct testimony, escalated into totally improper prosecutorial denigrating insinuations against defense counsel.

On cross-examination by the prosecutor, Costello testified that she had taken no notes of the conversation herself, and that before testifying, she glanced at defense counsel's notes simply to ascertain on what date in early November the interview occurred. She further testified that she had not relied on any of defense counsel's notes to refresh her recollection.

Subsequently, under the pretext of impeaching Costello, the prosecutor inferred the existence of another set of notes and repeatedly asked Costello, over strenuous and repeated defense objections, if defense counsel had destroyed such notes. The trial court overruled the defense objection that the existence of his notes, which had been resolved during discovery, was an improper subject to be brought before the jury, particularly on cross-examination of Costello.

 █ It was certainly improper for the prosecutor, under the guise of impeachment of Costello, to inform the jury of the existence of another set of notes and to imply that defense counsel had destroyed them. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 166-67, 398 N.E.2d 68, 77-78; *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 17-18, 351 N.E.2d 402.) Indeed, the only purpose and effect of this purported impeachment cross-examination was to voice the prosecutor's opinion to the jury that defense counsel had improperly kept certain notes from being disclosed at trial. Clearly, it is axiomatic that the existence of someone else's notes, especially those not relied on by the witness—let alone whether such notes were withheld or destroyed by defense counsel—would not impeach witness Costello. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 284-85, 393 N.E.2d 1098, 1117; *People v. Svizzero* (1967), 84 Ill. App. 2d 251, 228 N.E.2d 604.) A witness simply cannot be impeached by a statement that he did not make, prepare or adopt. Moreover, precisely because the witness did not make or rely on any notes to prepare her testimony, then whether or not defense counsel made two sets of notes—and whether the witness was incorrect in her belief that only one set of notes existed—was at most a collateral matter upon which attempted impeachment of her was prohibited. (*People v. Steptore* (1972), 51 Ill. 2d 208, 281 N.E.2d 642; *People v. Persinger* (1977), 49 Ill. App. 3d 116, 363 N.E.2d 897; *Peo-*

*ple v. Sisti* (1967), 87 Ill. App. 2d 107, 230 N.E.2d 500.) Consequently, the prosecutor's cross-examination of Costello on the alleged destruction or withholding of notes by defense counsel was therefore nothing more than an attempt to disparage defense counsel's integrity before the jury.

The prosecutor's exhaustive cross-examination of Costello (see Appendix) aggravated his dogmatic persistence in disclosing to the jury the existence of notes that were withheld from the witness, the prosecution, and the jury alike. Moreover, it was particularly intolerable for the prosecutor to bring before the jury the matter of defense counsel's notes, because the prosecutor knew, unlike the jury, that defense counsel's additional notes were his undiscoverable work-product and that defense counsel's compliance with discovery had been resolved before trial. The prosecutor also knew to limit his cross-examination to the substance of the particular interview conversation between Juana Buckner, Costello and defense counsel—having heard and being bound by the judge's ruling restricting the scope of his cross-examination, and having expressly agreed to abide by the trial court's confining cross-examination order. The prosecutor's persistent line of questioning and editorial comments concerning the existence of another set of notes were clearly improper.

The defendant urges that the prejudice to him by this prosecutorial impropriety was threefold, far surpassing the immediate damage to the credibility of the defense witness Costello. He argues that not only did the improper cross-examination unmistakably imply that defense witness Karen Costello must have been unaware of Juana Buckner's testimony, as reflected in another set of notes withheld or destroyed by defense counsel before trial, but also that the improper cross-examination implied that these other notes, by virtue of defense counsel's conduct in withholding them, contained materials damaging to the defendant's defense. The defendant cites *People v. Emerson* (1983), 97 Ill. 2d 487, 497, 455 N.E.2d 41, which holds:

> "[A]n insinuation which leads the jury to speculate may be more prejudicial than erroneously admitted specific proof."

Finally, the defendant insists that the erroneous cross-examination was prejudicial, because the jury was left with the impression that defense counsel (1) suborned perjury by deliberately hiding his notes from the defense witness; (2) destroyed evidence; and (3) deceptively kept matters contained in the notes from being seen by the prosecutor and the jury. We conclude that having undermined the integrity of defense counsel in the presence of the jury, the prosecutor's cross-examination of Costello also tainted defense counsel's representation of

the defendant and denied the defendant a fair trial. *People v. Starks* (1983), 116 Ill. App. 3d 384, 394, 451 N.E.2d 1298, 1305.

■■■ The defendant's next contentions that the total evidence against him was entirely circumstantial, was consistent with his innocence and failed to prove his guilt beyond a reasonable doubt are without merit. The hereinbefore-mentioned State's evidence, which we need not here repeat, is legally sufficient to legally compel a jury's factual determination of whether such evidence establishes the defendant's guilt beyond a reasonable doubt and preclude an exclusive legal determination that such evidence is legally insufficient to establish such guilt of the defendant. Accordingly, we reject these insufficient-evidence contentions of the defendant. *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.

The defendant additionally contends that inasmuch as the total evidence against him was completely circumstantial, the trial court erroneously denied the second paragraph of his tendered instruction, IPI Criminal 2d No. 3.02:

> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

■■■ The trial court's refusal to so instruct the jury must be affirmed in light of *People v. Bryant* (1986), 113 Ill. 2d 497, 507-12, 499 N.E.2d 413, which overruled *People v. Crow* (1985), 108 Ill. 2d 520, 536, 485 N.E.2d 381, on which defendant relies, and which held:

> "We now conclude that the 'reasonable theory of innocence' charge should not be used.
>
> &ast; &ast; &ast;
>
> The 'reasonable theory of innocence' charge is an attempt to express the reasonable-doubt standard in the vocabulary of circumstantial evidence. It is, in substance, an attempt to define reasonable doubt. We note that the jury in this case received the required instruction in the form of I.P.I. Criminal 2d, No. 2.03, on the presumption of innocence and the burden of persuasion; that instruction is given in every case, regardless of the type of evidence involved. The use of an additional instruction setting out the 'reasonable theory of innocence' charge may, however, confuse the jury. The language in the 'reasonable theory' instruction suggests that a unique standard governs cases in which the evidence of guilt is entirely circumstantial, that the burden of proof in those cases is different in some fundamental respect.
>
> &ast; &ast; &ast;

We conclude, then, that the second paragraph of I.P.I. Criminal No. 3.02 should no longer be used."

As in *Bryant*, the trial court in the case at bar gave jury instruction IPI Criminal 2d No. 2.03, on the presumption of innocence and the burden of persuasion. Since the supreme court held in *Bryant* that the tendered and refused second paragraph of the circumstantial evidence instruction is nothing more than an attempt to define reasonable doubt and is inappropriate, and since the jury was given IPI Criminal 2d No. 2.03, no error occurred when the trial court refused to give the tendered second paragraph of the circumstantial evidence instruction, IPI Criminal 2d, No. 3.02.

■■■ The defendant's contention that the trial court erred in refusing to give a voluntary manslaughter instruction, however, is meritorious. At the close of all of the evidence, defense counsel tendered to the trial court for submission to the jury IPI Criminal 2d Nos. 7.03 and 25.05E, which are the definitional and elemental jury instructions for voluntary manslaughter resulting from serious provocation. In support thereof, defendant's counsel argued, *inter alia*, that the circumstantial evidence of a fight and argument between Anderson and her assailant and the two knives recovered from the scene, at the very least, presented a jury question whether serious provocation or sudden and intense passion were ingredients of the homicide. Nevertheless, the trial court sustained the State's objection and refused to instruct the jury on voluntary manslaughter, the lesser included offense of murder. Where there is evidence of serious provocation and sudden intense passion, which, if believed by a jury, would cause the killing to be voluntary manslaughter rather than murder, an instruction to the jury defining voluntary manslaughter must be given. (*People v. Leonard* (1981), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358, 363; *People v. March* (1981), 95 Ill. App. 3d 46, 53, 419 N.E.2d 1212, 1217; *People v. Dortch* (1974), 20 Ill. App. 3d 911, 914, 314 N.E.2d 324, 325-26.) This is so even if the defense is that the defendant did not commit the homicide. (*Dortch*, 20 Ill. App. 3d at 914; *March*, 95 Ill. App. 3d at 53-54.) A defendant in a criminal case is entitled to have the jury consider any legally recognized defense which has a foundation, however tenuous, in the evidence. *Dortch*, 20 Ill. App. 3d at 914; *March*, 95 Ill. App. 3d at 53-54.

■■■ Mutual quarrel, combat, or assault is evidence of adequate provocation to require a voluntary manslaughter instruction. (*People v. Leonard* (1981), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358, 363; *People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451.) When the mutual combat occurs immediately preceding or during the infliction of death,

the voluntary manslaughter instruction may not be refused, even if the defendant was the aggressor at the outset. (*Leonard*, 83 Ill. 2d at 413-23; *People v. Craven* (1973), 54 Ill. 2d 419, 425, 299 N.E.2d 1.) Nor may the instruction be validly refused on the ground that there was evidence that defendant's intent to kill was formulated at an earlier time, if there is evidence that the defendant's criminal intent may have arisen during or out of the heat of the altercation. (*Leonard*, 83 Ill. 2d at 422-23.) Accordingly, the voluntary manslaughter instruction is required even if the evidence of mutual combat is only a momentary scuffle, and even if the remaining evidence is that the incident was a gun battle or shoot-out between the defendant and the deceased. (*People v. March* (1981), 95 Ill. App. 3d 46, 54, 419 N.E.2d 1212, 1218.) Evidence of a heated argument and exchange of blows justifies the giving of a voluntary manslaughter instruction. *People v. Sykes* (1977), 45 Ill. App. 3d 674, 678, 359 N.E.2d 897, 900.

In the case at bar, there was evidence of a violent, heated argument between the deceased and her assailant. First, the Buckners, the deceased's two neighbors, testified that they both overheard two voices "yelling" and "arguing" in the deceased's adjacent apartment. Both witnesses testified that they heard noises of furniture "banging and crashing" during the argument. The witness Cornell Buckner expressly stated that "it sounded like a struggle."

Second, there was evidence from which the jury could infer that the argument was provoked by the deceased's break-up with and leaving the defendant, Arthur Robinson. There was further evidence that the deceased was also angry because the defendant had taken rent money from the piggybank to buy beer.

Third, two knives were recovered from the homicide scene. One of the knives was on the bathroom commode beyond the vicinity of the deceased's body. Significantly, the second knife was found "near" the deceased—so near, in fact, the evidence technician had to move the deceased's body to retrieve the knife. As there was no eyewitness to the altercation, the jury could have found that a knife was in the deceased's possession at some point during the altercation, or even that the deceased obtained the knife at the outset. Accordingly, the State's failure to process either knife for fingerprints, when extensive processing for fingerprints was conducted on less critical items in the apartment, could have appeared to the jury as such a conspicuous omission unfavorable to the prosecution. (*People v. Howard* (1975), 29 Ill. App. 3d 387, 389, 330 N.E.2d 262, 264; *People v. Smith* (1971), 3 Ill. App. 3d 64, 67, 278 N.E.2d 551, 553; *People v. Jackson* (1961), 23 Ill. 2d 360, 364, 178 N.E.2d 320, 322.) Under the beforementioned

factual circumstances, the presence of a knife within the deceased's grasp could have been considered by the jury as evidence of her possession of the knife. (*People v. Howard* (1975), 29 Ill. App. 3d 387, 389, 330 N.E.2d 262, 264.) The jury might have considered it somewhat absurd that Anderson's assailant wielded two knives. The jury and not the trial court should have decided whether the presence of two weapons, together with the other evidence, was sufficient to make the homicide voluntary manslaughter rather than murder.

Fourth, according to both witnesses, Juana Buckner and Cornell Buckner, this heated domestic dispute, during which there was a struggle and violent acts of throwing furniture, lasted at least "fifteen—twenty minutes." The altercation was already in progress when the Buckners arrived home. There were no witnesses to how the altercation began or who was the aggressor therein. Consequently, the evidence was adequate to present a question of fact for the jury on when or whether Anderson's assailant formulated an intent to kill during a heated struggle. (*People v. Leonard* (1980), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358, 363.) The evidence was also adequate to make mutual quarrel or combat a question for the jury's determination. The supreme court held in *People v. Joyner* (1972), 50 Ill. 2d 302, 306-07, 278 N.E.2d 756:

"[I]n homicide cases, if there is evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining that crime should be given, if requested. * * *

* * * [I]t was possible for the jury to find the defendants guilty of murder, not guilty by reason of self-defense, or guilty of manslaughter. The last option should have remained open to the jury and the jury should have been instructed in this regard. * * *

* * * [T]he defendants' failure to tender the appropriate I.P.I. instruction was not as important with reference to the fundamental fairness of their trial as the requirement that the jury be fully and properly instructed. The failure to instruct on this important aspect of the case necessitates a remand for a new trial."

The trial court committed reversible error in refusing to instruct the jury, via the tendered IPI instructions on voluntary manslaughter.

Because we reverse the defendant's conviction and remand the cause for a new trial, we decline to decide the defendant's final contention that on the facts in the case at bar, the trial court abused its discretion in imposing an extended 70 years' imprisonment sentence.

Should there be a conviction upon retrial, the trial court perhaps may consider, *inter alia,* some of the views and factors expressed herein in imposing the appropriate sentence.

For the reasons hereinbefore stated, the defendant's judgment of conviction is reversed and the cause is remanded for a new trial.

Reversed and remanded.

LORENZ, J., concurs.

## APPENDIX

Cross-examination of defense witness Karen Costello by Assistant State's Attorney Daniel Frank:

"PROSECUTOR: I show you what will be marked up at the corner [as] People's Exhibit Number 42, ask you if you can—if you can identify that piece of paper?

A. These are [defense counsel's] notes from the conversation.

Q. Well, when did he make those notes, do you know?

A. He made some notes during the course of the conversation as we were talking to Miss Buckner.

Q. Did he destroy those notes and write those later?

A. Pardon?

Q. Did he destroy those original notes and write that with you later on?

A. No, he did not.

Q. So, it is your understanding that those are the original notes?

A. Yeah, that's my understanding.

Q. You saw those notes when? When is the first time you saw those notes?

A. Well, I—I mean, I saw him writing down the notes during the course of that conversation.

Q. You weren't looking over his shoulder knowing what he was writing down, were you?

A. No.

Q. When did you see that piece of paper for the first time?

A. I saw this piece of paper this morning.

Q. So, you have no idea when he wrote those notes, is that correct? There's no time stamp on there, is there?

A. There is a notation.

[DEFENSE COUNSEL]: Judge, I object. She testified she

believes those are the original notes.

THE COURT: Overruled." (Record, at 755-56.)

"[PROSECUTOR]: Q. It is indicated on here when the conversation took place, is that right?

A. The date.

Q. Fine. Did you come back to the office, the Public Defender's Office, and talk amongst yourselves about what Juana Buckner had told you?

A. Yes, we did.

Q. And did [defense counsel] take notes then when he talked to all—all of you together?

A. I believe so.

Q. Were those these notes, the composite notes?

A. I don't think so, but I don't definitely remember.

[PROSECUTOR]: May I have those notes then?

[DEFENSE COUNSEL]: Pardon me?

[PROSECUTOR]: May I have the notes that you have regarding the conversation with [defense witness] Miss Costello?

[DEFENSE COUNSEL]: You have already been tendered three sets of notes, Mr. [prosecutor].

[PROSECUTOR]: May I have the rest of them?

[DEFENSE COUNSEL]: Judge, let's have a sidebar. I gave them to the [prosecutor].

[PROSECUTOR]: I want the original." (Record, at 757.)

The proceedings of the sidebar were, in part, as follows:

"THE COURT: All right. What was the point of this sidebar?

[DEFENSE COUNSEL]: Judge, I object to the State's attorney—.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Well, he may ask in front of the jury where are the original notes?

THE COURT: That's not what he asked.

[DEFENSE COUNSEL]: He did, Judge, in front of the jury.

He turned around and said, where are the original notes? Judge, that is totally improper to do in front of the jury.

[PROSECUTOR]: This was identified as originals. I asked for the notes that she said were made later.

THE COURT: All right, overruled." (Record, at 761-62.)

The following proceedings were in the presence and hearing of the jury.

"[PROSECUTOR]: Q. Miss Costello, the notes I showed you,

do you know if those are—you believe those to be the original notes, is that correct?

A. That's correct.

Q. But, you did see [defense counsel] when you got back to the office here in the building taking notes when you had a conversation between yourself, Mr. Figura, and [defense counsel] relative to the conversation with Juana Buckner at the Belair Hotel, is that correct?

A. That's correct.

Q. Did you see those notes?

A. I don't remember seeing those notes, no.

Q. So, as far as I understand then, there were two separate sets of notes, is that correct, that [defense counsel] took?

A. I don't know how separate they were. I mean, they may have been on the same sheets. They were scratches really." (Record, at 762-63.)

"[Defense counsel] was the experienced trial lawyer on this case, is that correct?

[DEFENSE COUNSEL]: Objection to that.

A. Correct.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Form of the question.

THE WITNESS: That's correct.

[PROSECUTOR]: Was your recollection of the conversation that you took no notes of over a year ago more complete than the notes that [defense counsel] took on or around November 8?

A. I don't know how complete—.

[DEFENSE COUNSEL]: Judge, objection.

A. [Defense counsel's] notes are.

THE COURT: Overruled.

A. I know that my recollection is complete. I remember distinctly this conversation. I remember losing sleep over this investigation and—of this—***.

Q. *** [P]lease answer my question. Is your recollection more complete than [defense counsel's] notes?

A. I don't know because I don't—I can't say as to how complete [defense counsel's] notes are.

Q. These are the only notes we know about, Miss Costello." (Record, at 770-71.)

PRESIDING JUSTICE MURRAY, specially concurring:

I agree with the majority that this case must be reversed and re-

manded for a new trial because of the State's use of Robinson's statements of a totally unrelated threat to a third person.

I do not agree with much of the remaining comments of the majority, particularly the charges of prosecutorial misconduct. An error in the introduction of evidence does not necessarily rise to the level of prosecutorial misconduct.