2019 IL App (2d) 170787-U
No. 2-17-0787
Order filed November 21, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1253 |
| DALE L. WELLS, | ) ) | Honorable Christen L. Bishop, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Birkett and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The State proved defendant guilty beyond a reasonable doubt of aggravated battery, as the trial court was entitled to credit the State's evidence over defendant's and find that defendant struck a police officer and had the required mental state.

¶ 2    Defendant, Dale L. Wells, appeals from his conviction of one count of aggravated battery (insulting or provoking contact with a law enforcement officer performing his official duties) (720 ILCS 5/12-3.05(d)(4)(i) (West 2016)).   He asserts that, largely because of inconsistencies in the witnesses' testimony, the evidence was insufficient to support his conviction.   We find that the evidence was sufficient, and we therefore affirm.

¶ 3                                 I. BACKGROUND

¶ 4                            A. The State's Evidence

¶ 5     At the bench trial, the State's evidence consisted of the testimony of two officers employed by the Zion Police Department: Paul Sage, a patrol officer, and Eric Barden, a patrol sergeant. They testified that they drove separately to the intersection of Gilead Avenue and 28th Street in Zion.    Two parties were in progress, a bonfire at defendant's home at 2722 Gilead Avenue and a cookout diagonally across the intersection at 2801 Gilead Avenue.    Defendant, known to the officers as "a person who *** likes to incite a police response," was involved in a "verbal altercation" with George Franklin, known to the officers for unspecified reasons.    Sage intervened by interposing himself between defendant and Franklin.    Defendant struck Sage on the chest while moving past him.    Sage tackled him from behind and, after a struggle in which Sage pepper-sprayed defendant, took defendant into custody.

¶ 6                            1. Testimony of Paul Sage

¶ 7     Sage testified that, on the night of May 6, he was in uniform and was patrolling alone in a marked car.    He arrived at 2801 Gilead Avenue at about 10:45 p.m.    Barden was already present when Sage arrived.    Barden, like Sage, was in uniform and was driving a marked car.

¶ 8     Sage observed two clusters of people, one of 5 to 10 people in the driveway of 2801 Gilead Avenue and a second of 15 to 20 people in the street near the intersection of 28th Street and Gilead Avenue.    Defendant was part of the group in the street.    Sage recognized defendant as someone who "places himself in situations that allow for an opportunity to sue police."    Defendant was involved in a "verbal altercation" with a man Sage believed was Franklin.    Members of the crowd appeared to be trying to separate the two.    Sage and Barden stayed with the group in the driveway

while monitoring the altercation. On cross-examination, Sage agreed that he had also been told that defendant was "drunk and attempting to fight people at the barbecue."

¶ 9 Some short time later, the "altercation *** escalated." Defendant's voice became louder and he started "advancing toward *** Franklin," "yelling at him, shouting, fighting words and expletives, while Franklin was "walking away from the situation." Moreover, "the crowd was having a hard time controlling [defendant]." Sage believed that members of the group in the street were going to "intervene in some physical manner" to keep defendant from attacking Franklin. To prevent that, Sage approached defendant and "yell[ed]" at him, telling him to "cease his actions." On cross-examination, Sage said that defendant got within "[m]aybe 50 feet or less" of Franklin when Sage intervened. Sage positioned himself between defendant and Franklin, facing defendant with his hands up: he "plead [*sic*] with him to stop."

> "I think the group was also pleading with him to stop advancing. He said something to the effect of 'Fuck the police, I will fight them too.' I put my hands up attempting to stop his body from going any further at which point he struck me in the chest with a closed fist."

Sage was wearing a ballistic vest, but he felt defendant's closed-fisted punch. After punching Sage, defendant "advanced pas[t]" him. Sage responded by "grabb[ing defendant] from behind[,] keeping his arms down," and "attempt[ing] to pull him to the ground." Sage forced defendant off the pavement and pulled him to the ground in a grassy area. Barden was nearby and went to assist Sage. Defendant resisted the two as they tried to handcuff him, acting "belligerent[ly and as though he was] possibly intoxicated." As defendant resisted, Sage pepper-sprayed him. Once Sage got defendant to the police station and washed the pepper spray out of his face, defendant was compliant.

¶ 10                     2. Testimony of Eric Barden

¶ 11     Barden testified that he arrived at 2801 Gilead Avenue in response to a report of a fight or disturbance.   He found a "large group" of people standing "kitty-corner" to one another across the intersection of Gilead Avenue and 28th Street.   An altercation was underway in the intersection.   Barden recognized defendant as one of the participants.

> "[Defendant] was just screaming and he was very agitated, very irate.   People were pushing him back to distance him, it was kind of like a high school fight, where people are holding back.   They were separating him from the initial group."

Barden and Sage spoke with members of the group at 2801 Gilead Avenue while they monitored the situation.   Not long after they arrived, the disturbance became more intense.   Some of the people in the crowd tried to restrain Franklin, but he broke free and started to approach defendant. "[Franklin and defendant] got into an altercation in the alleyway *** [with] screaming and shouting, what appeared to be—or what was going to be a fight."   They were circling one another "like a boxer would do," but Barden could not tell whether they were making physical contact with one another.

¶ 12     While Sage approached defendant, Barden approached Franklin and walked him away from the crowd.   Defendant started to follow Franklin.   Sage interposed himself between defendant and Franklin and "kind of push[ed] his hands up, like stop, stop, stop."   Defendant started pushing against Sage's hands.   Barden had to turn his back to Sage, but he heard defendant and Sage "start to get into a scuffle."   When he turned back toward Sage, Sage was on the grass near the street.   Sage had his pepper spray out and had "wrapped [defendant] up in *** a bear hug."   As Barden started helping Sage control defendant, he heard Sage discharge his pepper spray in a brief burst.   The spray hit both Barden and defendant, but Barden helped Sage handcuff defendant.

¶ 13    The State rested after Barden's testimony.

¶ 14                              B. Defendant's Evidence

¶ 15    Four witnesses testified for the defense: Wilbert Moore, defendant's cousin; Breanna Woodside, who lived at 2722 Gilead Avenue with defendant because her mother, Kasey Burton, was defendant's live-in caregiver; Jenifer Olsen, a friend of all the residents at 2722 Gilead Avenue; and Burton, the caregiver.   They all testified that defendant had confronted Franklin to break up a fight or argument and that defendant was not aggressive toward Franklin.   None saw defendant strike Sage, and all agreed that Sage tackled defendant when defendant was walking away from the area where the confrontation occurred.   Defendant also introduced an aerial photograph of the intersection at which the incident occurred.

¶ 16                              1. Testimony of Wilbert Moore

¶ 17    Moore testified that, on May 6, 2016, he attended a bonfire at defendant's house.   Moore had known defendant since 1985 and saw him frequently.   Moore witnessed the "altercation" and defendant's arrest while looking over the fence that surrounded defendant's back yard.   When the police arrived, defendant was in the "driveway and the street of the house where the situation was." He had crossed the street to "deffuse [*sic*] [a] situation" involving Franklin.   Defendant dodged a blow from Franklin.   He was walking away when an officer tackled him from behind.   Moore did not see defendant strike either officer; he did see the officers use pepper spray against defendant.

¶ 18    On cross-examination, Moore described more details of the altercation.   Franklin "was swinging" at defendant and struck him once with a glancing blow; defendant dodged six or seven punches.   Moore heard defendant say to Franklin, " 'Ain't nobody going to touch me.' "   Moore denied that defendant made any comment of the kind to the police.   Moore at first denied that

defendant had told the police, " 'fuck this,' " but he later agreed that defendant made that comment as he walked away from Franklin.

¶ 19                     2. Testimony of Breanna Woodside

¶ 20    Woodside testified that she and defendant were in the back yard of their house when the police arrived.   Woodside saw the police join the group at 2801 Gilead Avenue and start speaking to her neighbor "Jeff."   An altercation started across the street.   Defendant crossed the street in response to the altercation and got into a fight with Franklin.   Franklin struck at defendant, hitting him more than once.   Defendant did not fight back; he tried to return home.   The fight did not last long.   Defendant got away from Franklin and started walking back to the house.   Defendant was still in the yard of "the [other] house" when a police officer "attacked him, [and] arrested him."   The officer "[r]an up behind [him] and grabbed him, threw him to the ground by the arms, it was a quick approach, it was just a pushdown."   Defendant said nothing to the officers while this was happening.   The officers pepper-sprayed defendant while he was lying on the ground. One officer pulled defendant's head up by his hair and sprayed him in the face.

¶ 21                     3. Testimony of Jenifer Olsen

¶ 22    Olsen was present at the bonfire at defendant's house because she "kn[e]w both Kasey [Burton] and the kids"; she was friends with defendant as well.   She testified that defendant was in his back yard shortly before the police arrived, but, shortly after they arrived, he crossed the street to break up a fight between Franklin and someone she did not know.   As that fight ended, Franklin started to "swing on" defendant.   Defendant dodged, but Franklin hit him "a couple" of times.   This occurred in the street in front of 2801 Gilead Avenue.   The fight between Franklin and defendant ended on its own, and the two started to walk away from each other, defendant toward his house and Franklin toward Jeff's house.   That was when the police intervened:

"The police came and attacked [defendant] from behind, the police were watching the entire fight, they didn't try to break it up at all. Once defendant tried to walk back to his house, that is when the police attacked, handcuffed him, maced him."

Sage "tackled [defendant] from behind, threw him on the ground, [and] handcuffed him." He "lifted [defendant's] head up and maced him." Olsen never saw defendant strike either officer.

¶ 23                    4. Testimony of Kasey Burton

¶ 24    Burton explained her relationship with defendant as follows:

"I am his caretaker. [Defendant] cannot read or write [and] I take care of him. I make sure he goes to his medical appointments, make sure he gets proper meds. I pay his bills, all of that stuff."

¶ 25    Burton testified that defendant and Franklin were involved in two physical confrontations. First, defendant crossed the street from his back yard to break up an argument between Franklin and a person Burton did not know. On direct examination, Burton said that defendant urged Franklin to calm down and Franklin walked away. On cross-examination, Burton said that Franklin took about three swings at defendant before leaving. Franklin returned a little over a minute later and confronted defendant "in the middle of the intersection." Franklin "began to yell and swing at him some more." He took about 10 swings at defendant, defendant evaded the blows, and then "they broke each other up [*sic*]." "[Franklin's] friends dragged him away from the scene."

¶ 26    As defendant "was heading home[,] *** one of the police officers"—Sage—"slammed [him] and put him in handcuffs." Sage tackled defendant from behind and threw him to the ground. Sage then "immediately handcuffed [defendant], and then *** lifted [defendant's] head

and sprayed him with mace." This occurred in the grass across the street from both defendant's and Jeff's houses.

¶ 27 The State did not present any evidence in rebuttal.

¶ 28                    C. The Court's Findings and Judgment

¶ 29 The court, after discussing the evidence in detail, found defendant guilty. It deemed Sage and Barden credible. It deemed implausible the defense witnesses' description of defendant attempting to quell an argument between Franklin and another man:

> "The *** Court has to consider the credibility, bias, and just motive of the witnesses. And in looking at that, the defense witnesses clearly—their consistent theme, for lack of a better word, was that the defendant was—none of them testified about him being loud or an instigator.

> The Court can also make reasonable inferences. In making the reasonable inference, the Court wonders why the defendant would leave his yard when he was having friends over to insert himself into something that had nothing to do with him and then simply walk back to his house. Is it more consistent the story given by the defense witnesses or more consistent a reasonable inference *** that somebody would leave their house to go insert themselves into an altercation that had nothing to do with them and would be loud continuing to argue and scream? It just doesn't make any sense that the defendant would just leave and go over there and not have a problem and then walk back to his house. I don't think that makes any sense."

The court was also skeptical of the defense witnesses' description of Franklin's physical aggression toward defendant.

¶ 30    Defendant moved for reconsideration, asserting that the State's evidence did not support his conviction.    The court denied that motion, noting that it continued to find the State's witnesses credible.    After discussing defendant's physical and mental health problems at length, the court sentenced defendant to 30 months' intensive probation with 12 months' periodic imprisonment. Defendant timely appealed.

¶ 31                                   II. ANALYSIS

¶ 32    On appeal, defendant asserts that the "State failed to prove [him] guilty *** because Officer Sage's testimony that [defendant] intentionally struck him in the chest was not credible and was disputed by four eyewitnesses."    In any event, he asserts that the contact with Sage was "[a]t most *** so slight as to be inadvertent and not committed knowingly."

¶ 33    Defendant advances five bases for reversal.    One, "the four witnesses for the defense were consistent in their trial testimony about what they saw take place that night, and none of them saw [defendant] strike the officer."    All four testified that defendant was headed back toward his house when Sage tackled him.    Two, Sage's and Barden's descriptions of defendant's aggression were inconsistent: Sage described defendant as the primary aggressor, while Barden said that defendant and Franklin were shouting at one another.    In contrast, the defense witnesses, with less motive to deceive than Sage, all said that Franklin was the aggressor and physically attacked defendant. Three, Sage was biased not only by his need to justify his tackling and pepper-spraying of defendant but also by his knowledge of defendant's reputation for provoking and suing the police. Four, "with the number of onlookers present at the scene, it is inexplicable that the State could produce no other witness to corroborate Sage's story."    Defendant asks us to apply the rule in *People v. Smith*, 3 Ill. App. 3d 64, 67-68 (1971), which held that the State's failure to call occurrence witnesses to corroborate the contradictory, impeached, uncorroborated, and incomplete

testimony of its "prime witness" "warrants invoking the inference that the witnesses available to the State, if called, would have testified adversely to the prosecution." Five, because Sage testified that defendant's punch was not " 'very hard,' " defendant argues that the evidence was consistent with his contact with Sage being unintentional and that, furthermore, nothing in the evidence suggests that defendant intended to be insulting or provoking.

¶ 34 The State responds first that "defendant asks this court to [improperly] substitute its judgment for [that of] the trier of fact and to draw completely opposite conclusions about the credibility of the witnesses." It contends that, in any event, the evidence supported the court's credibility determinations. Second, it argues that the facts in *Smith* make its holding support the State's position, not defendant's. Third, it argues that, "[b]y continuing to advance toward Officer Sage and ignore his directives *** it is clear that defendant was 'consciously aware' that making an offensive contact with Sage was 'practically certain' to result."

¶ 35 We hold that the evidence was sufficient; the testimony of Sage and Barden was sufficient to sustain the conviction. That testimony (1) adequately supported the conclusion that defendant struck Sage and (2) adequately supported the inference that defendant's striking of Sage was done with the required *mens rea*. Moreover, we decline to apply the inference suggested by the *Smith* court; we partially reject the reasoning in *Smith*, and, in any event, we deem a negative inference to be inappropriate under the circumstances.

¶ 36 We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237 (1985). When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in

original.)  *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319).  "[W]here the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt," but, "[i]n conducting this inquiry, the reviewing court must not retry the defendant."  *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004).  "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt."  *Cunningham*, 212 Ill. 2d at 280.  Although great deference is accorded to the fact finder's conclusions concerning the credibility of testimony, and although the evidence must be viewed in the light most favorable to the prosecution, the fact finder's decision is not conclusive.  *Cunningham*, 212 Ill. 2d at 280.

¶ 37     Viewing the evidence in the light most favorable to the State, a rational trier of fact could have properly concluded that defendant struck Sage.  Sage testified consistently that, as he tried to prevent defendant from following Franklin, defendant struck him on the chest.  Barden corroborated Sage's testimony in that Barden testified to seeing Sage interpose himself between defendant and Franklin.

¶ 38     We consider defendant's five points in order.  First, although we agree that the four defense witnesses' testimony contradicted Sage and Barden on the matter of whether Sage confronted defendant before tackling him, thus positioning defendant to strike Sage, that contradiction is not a basis for reversal.  Under the standard of *Jackson* and *Collins*, "[t]he trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts."  *People v. Harris*, 2018 IL 121932, ¶ 26.  It was thus for the trial court to decide which witnesses were more credible; nothing in the law requires that the side with more witnesses be found more persuasive.  Moreover, beyond the standard

deference that we give to the trial court's credibility determinations, we see a logical basis for accepting the court's decision to credit the officers over the bystanders. The officers, particularly Sage, were directly involved in the action and thus needed to be paying constant attention to what was happening; the bystanders were not so involved. The officers were therefore much less likely to overlook part of the interaction.

¶ 39 Second, although defendant is correct in noting that Sage and Barden partially contradicted one another's descriptions of the events before Sage confronted defendant, the discrepancies are again not a basis for reversal. Sage said that defendant was "advancing toward *** Franklin," "yelling at him, shouting, fighting words and expletives," while Franklin was "walking away from the situation." By contrast, Barden described the pair as being aggressive toward one another, yelling and circling like boxers. But that discrepancy does not seriously impeach either's testimony. The critical moments were those just before and just as defendant and Sage approached one another. Before that, the officers were merely professionally involved bystanders and unlikely to be observing in the same way that they would once they became directly involved. We recognize that Sage was alone among the five witnesses in portraying defendant as the aggressor in the confrontation with Franklin, suggesting that he might have been wrong on that point. But a mistake by Sage in perceiving the nature of the altercation, which, after all, occurred in a crowd, need not cast doubt on how accurately he perceived what occurred once he approached defendant. Further, although defendant's state of mind before the encounter with Sage was certainly relevant, it did not go directly to any element of the offense. Thus, the inconsistency was essentially a minor one. Minor inconsistencies between witnesses' testimony may affect the weight of the evidence, but such inconsistencies do not necessarily create a reasonable doubt of guilt. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. Furthermore, a trier of fact may accept

part of a witness's testimony while rejecting other parts. See *Corral*, 2019 IL App (1st) 171501, ¶ 85 ("The trier of fact may accept or reject all or part of a witness's testimony."). Thus, that possible error in Sage's testimony is not a basis for reversal.

¶ 40 Third, we reject defendant's claim that Barden and Sage were so clearly biased against him that their testimony must be discredited. We agree with defendant that his prior interactions with the police might have caused the officers to harbor some bias against him. But we also agree with the State that defendant's witnesses—a friend, a family member, and two household members— were likely biased in favor of defendant. The court as trier of fact thus had to decide which witness—if any—were credible. We do not substitute our judgment for that of the trier of fact on issues of the credibility of the witnesses. *People v. Ressa*, 2019 IL App (2d) 170439, ¶ 42. Nothing in the evidence suggests that either officer's testimony was so tainted by bias that "no reasonable person could accept it beyond a reasonable doubt" (*Cunningham*, 212 Ill. 2d at 280). We thus must accept the court's conclusion that Sage and Barden were credible despite their possible bias.

¶ 41 Fourth, defendant, citing *Smith*, suggests that the State's failure to call other occurrence witnesses when the police knew that such witnesses existed permits us to draw the inference that the testimony of those witnesses would have been unfavorable to the State. We do not agree. If we assume *arguendo* that *Smith* is valid, we nevertheless conclude that it does not support our inferring that the "missing" witnesses' testimony would have favored defendant. However, we think that, in *People v. Doll*, 371 Ill. App. 3d 1131, 1137 (2007), we addressed when such negative inferences are appropriate in a more logical way.

¶ 42 In *Smith*, Melvin Crumpton, the sole occurrence witness in a trial for murder by stabbing, testified that he had seen the defendants holding a man down, searching his pockets, and, 10

minutes later, with a crowd watching, dragging him down a staircase. *Smith*, 3 Ill. App. 3d at 66. Crumpton was impeached by several prior inconsistent statements and by his admission that he had been drinking heavily at the party. *Smith*, 3 Ill. App. 3d at 66-67. The *Smith* court, in overturning the defendants' convictions, concluded that, given the weakness in Crumpton's testimony and the State's failure to produce any of the other occurrence witnesses that Crumpton's testimony implied should exist, it could infer that the testimony of those witnesses would not match Crumpton's. Thus, "the totality of the circumstances *** warrant[ed] invoking the inference that the witnesses available to the State, if called, would have testified adversely to the prosecution." *Smith*, 3 Ill. App. 3d at 67-68. The logic seems to be that, had Crumpton's testimony been true, (1) there would have been other witnesses to the defendants' dragging the victim downstairs, and (2) the State would have been able to produce them to testify to that event at the trial. The second assumption strikes us as possibly naïve, but putting that aside for the moment, the circumstances are distinguishable. It is one thing to assume that bystanders would notice a body being dragged downstairs, but another to assume that bystanders would notice a light blow during a confusing altercation. We cannot infer, from the lack of a second witness to testify to the blow, that no blow occurred.

¶ 43    In any event, as we noted, our analysis in *Doll* avoids the problems we see in *Smith*. In *Doll*, the defendant argued that the State's failure to call certain civilian occurrence witnesses gave rise to the inference that those witnesses' testimony would have been unfavorable to the State's case. *Doll*, 371 Ill. App. 3d at 1137. We disagreed. We held that drawing a negative inference from "missing" testimony for the State is appropriate only when the "witness's relationship with the State is such that he would ordinarily be expected to favor it" and that, even then, such an inference is inappropriate "when the witness is also known and available to the defense yet is not

called by it." *Doll*, 371 Ill. App. 3d at 1137. Thus, unlike the *Smith* court, we would not draw a negative inference based *solely* on the State's failure to have bystanders testify. Here, the witnesses whom defendant claims the State should have called were not necessarily friendly to the police and, in any event, nothing in the record suggests that they were more available to the State than to defendant. Thus, under *Doll*, no negative inference from the "missing" testimony is appropriate.

¶ 44　Fifth and finally, defendant argues that, because Sage testified that the punch defendant gave him was " 'not very hard,' " the evidence was consistent with his contact with Sage being unintentional. He also implies that nothing in the evidence suggested that he intended the contact to be insulting or provoking. We hold that the evidence was sufficient to allow the court to conclude that defendant had the necessary *mens rea*.

¶ 45　A defendant commits the relevant form of battery if "he or she knowingly without legal justification by any means *** makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a)(2) (West 2016). This requires *at least* that defendant have intended to strike Sage. Defendant suggests that it further requires that he have struck Sage with the intent to insult or provoke or at least the knowledge that insult or provocation would almost certainly occur. Some authority supports the stricter reading. For instance, the court in *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992), held that, to be found guilty of battery causing great bodily harm, a defendant "must be consciously aware that his conduct is practically certain to cause great bodily harm." *Psichalinos*, 229 Ill. App. 3d at 1067. We here give defendant the benefit of the stricter reading.

¶ 46　Barden described defendant as pushing against Sage's hands before striking him. Further, Sage heard defendant say "something to the effect of 'Fuck the police, I will fight them too.' " If

the court credited those parts of the officers' testimony—as was its prerogative—it had compelling evidence that defendant's striking of Sage was intentional. In short, defendant was looking for a fight, so it is fair to infer that he hit Sage on purpose. That same evidence supports the conclusion that defendant intended the contact to be insulting or provoking. To be sure, defendant's exclamation suggested an intention more to cause pain or injury than to insult or provoke. But a blow intended to cause pain or injury is also one that is practically certain to be provoking, and defendant would have known this. Thus, the evidence supported finding that defendant had the necessary *mens rea*.

¶ 47                                III. CONCLUSION

¶ 48    For the reasons stated, we affirm defendant's conviction.

¶ 49    Affirmed.